UNITED STATES ᴇᴛ ᴀʟ. *v.* CHESAPEAKE & OHIO
RAILWAY CO. ᴇᴛ ᴀʟ.

No. 75–420.   Argued April 26–27, 1976—Decided June 17, 1976

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which STEWART, J., joined, *post*, p. 521. POWELL, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Friedman* argued the cause for the United States et al. On the briefs were *Solicitor General Bork, Assistant Attorney General Kauper, Carl D. Lawson, Fritz R. Kahn, Betty Jo Christian, Hanford O'Hara,* and *Arthur J. Cerra.*

*Doyle S. Morris* argued the cause for appellees. With him on the briefs were *Owen Clarke, Charles C. Rettberg, Jr., George D. Gibson,* and *E. Milton Farley III.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

This case is here on direct appeal, pursuant to 28 U. S. C. §§ 1253,[1] 2325, from an order of the District Court which permanently enjoined the Interstate Com-

---

[1] For cases filed after March 1, 1975, review of Interstate Commerce Commission orders is in the court of appeals with further

merce Commission from enforcing, against the appellee railway system,[2] an order requiring the application of increased revenues to deferred capital improvements and deferred maintenance as a condition for the nonsuspension of the rate increases. 392 F. Supp. 358 (ED Va. 1975).

In April 1974, the Nation's railroads,[3] including the appellees, filed with the Interstate Commerce Commission a joint petition for a general revenue increase "with respect to the revenue needs of all carriers by railroad operating in the United States." App. 97. *Ex parte No. 305,* Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974. The proposed tariffs included a 10% increase in the level of freight rates. In their petition, the railroads alleged in part:

"The railroad industry is capital-intensive and must generate huge amounts of capital annually just to replace stationary facilities and equipment as it becomes worn out or obsolete. When earnings are inadequate to support this level of spending, as now, then a process of asset liquidation occurs accelerating as facilities and equipment are consumed by increased traffic. Even if the liquidation of assets is arrested by earnings sufficient to support maintenance and replacement there is a further need to modernize and expand capacity if the railroads are to be able to meet sharply increasing demands

---

review possible by petition for writ of certiorari to this Court. Pub. L. 93–584, 88 Stat. 1917. The present case was filed prior to March 1, 1975.

[2] Appellees are the Chesapeake and Ohio Railway Co., the Baltimore and Ohio Railroad Co., and the Western Maryland Railway. These railroads are known as the Chessie System and will be referred to as such or as Chessie throughout this opinion.

[3] Except the Long Island Railroad.

upon them for economic and efficient transportation. There is presently an abundance of data and analysis which reliably establishes that billions of dollars are needed immediately and in the coming decade for maintenance and improvement of the Nation's rail transportation plant." App. 107.

On June 3, 1974, the Commission entered an order which noted "that the nation's railroads are in need of additional freight revenues to offset recently incurred costs of materials, other than fuel, and to provide an improved level of earnings . . . ." Jurisdictional Statement 42a. The Commission found that the Nation's railroads were "in danger of further deterioration detrimental to the public interest . . . ," *ibid.*, and recognized that "without the additional revenues to be derived from increased freight rates and charges, the earnings of the nation's railroads would be insufficient to enable them under honest, economical and efficient management to provide adequate and efficient railroad transportation services . . . ." *Ibid.* The Commission concluded that "the increases proposed would, if permitted to become effective, generate additional revenues sufficient to enable the carriers to prevent further deterioration and improve service." At the same time, it noted that "if the schedules were permitted to become effective as filed and without conditions designed to promote service improvements, the increases proposed would be unjust and unreasonable and contrary to the dictates of the national transportation policy . . . ." *Id.*, at 42a–43a. The Commission, therefore, suspended the operation of the new schedules, but authorized the railroads to file new tariffs, subject to conditions providing that revenues generated by the increases "should be expended for capital improvements and deferred maintenance of plant and equipment and the amount needed for in-

creased material and supply cost, other than fuel."
*Id.*, at 46a.[4]

On July 18, 1974, the Commission entered the second
pertinent order in this case. This order defined "deferred
maintenance"[5] and "delayed capital improvements."[6]

---

[4] The Commission elaborated:

"The Commission has previously expressed its dissatisfaction with
the evidence introduced by the respondents in general revenue pro-
ceedings. In the subject proceeding, the evidence introduced by
the railroads is far from satisfactory, especially, for example, the
respondents' failure to identify and quantify the costs of deferred
maintenance." Jurisdictional Statement 47a.

". . . Accordingly, as previously indicated, the Commission intends
that revenues generated by increases authorized herein, over and
above the amount needed for increased material and supply costs,
other than fuel, will be used by the respondents exclusively for
reducing deferred maintenance of plant and equipment and delayed
capital improvements in order that rail *service* to the shippers will
be improved. The Commission expects that the authorized increases
will enable the respondents to expend substantially more for main-
tenance and capital improvements than in recent years and will
evaluate respondents' compliance with this directive. Respond-
ents' failure to apply the increased revenues as heretofore specified
will result in the cancellation of these authorized increases." *Id.*,
at 48a. (Emphasis in original.)

[5] "[T]he accrued deterioration or deficiency in the physical
operating condition of railroad track structures, cars and locomo-
tives, and other property used in the provision of transportation
service resulting from the failure and/or inability to properly
maintain plant and equipment, which produces an adverse effect on
railroad operations to an extent that services to shippers have been
rendered partially or wholly inadequate and/or has resulted in
diminishing the railroads' competitive ability . . . ." *Id.*, at 56a.

[6] "[A]ctually planned, specifically identified capital improvements
necessary for the provision of adequate or improved transporta-
tion service to shippers and which had not been undertaken,
scheduled, or otherwise committed because funding . . . was not, or
projected to be, available through June 30, 1975. They exclude
improvements in progress and those scheduled or otherwise com-
mitted and recognized in capital budgets in effect are applicable

The order also provided that "up to 3 percentage points of the 10-percent authorization may be applied to increased material and supply costs, excluding fuel, provided such costs have been incurred." *Id.*, at 59a. The order also permitted increased income taxes to be excluded in determining the balance of funds to be applied to deferred maintenance and delayed capital improvements.

On July 30, appellee Chessie System sought reconsideration of the Commission's order of July 18 "for the reason that under the Commission's definitions of deferred maintenance and delayed capital improvements they will be unable to apply any of the increased revenues derived from the Ex parte No. 305 proceeding (other than those earmarked for increased material and supply costs) to any projects now scheduled or which may be scheduled in the foreseeable future." App. 222. Chessie alleged it had no such "deferred maintenance" or "delayed capital improvements":

> *"No worthwhile project on Chessie System designed to improve its transportation service to the shipping public has ever been deferred because financing or funding was not available. None will be as long as Chessie System earnings are at levels adequate enough to attract capital. Chessie System has never stinted in its expenditures to provide adequate and efficient transportation service to its customers."* (Emphasis in original.) *Id.*, at 223.

on June 1, 1974. These capital improvements are further identified as delayed expenditures which would (1) add to or improve the carriers' plant and/or equipment so as to increase its usefulness, capacity, durability and efficiency, and (2) which are capitalizable in the property accounts in accordance with the Commission's accounting regulations . . . ." *Ibid.*

Chessie further noted that it had made significant expenditures for capital improvements in the six months prior to the Commission order. It pointed out that these projects did not qualify under the Commission's definition because the funds had been committed before June 1, 1974, and the projects "had not been deferred because funding or financing was not available." *Id.*, at 224. Unless it was permitted to apply these additional revenues to these earlier commitments, contended Chessie, "[t]hey will simply lie dormant in a sterile, segregated account which will result in several serious consequences both to Chessie System and the shipping public." *Id.*, at 225. Basically, argued Chessie, the consequence of the order was to place Chessie "at a distinct competitive disadvantage vis-à-vis other railroads, which for one reason or another have deferred maintenance or delayed capital improvements within the meaning of the Commission's order. These lines will be able to use the additional revenues to buy cars and other equipment while Chessie System's money will lie fallow. In effect, the order penalizes Chessie System and other efficient carriers and rewards only those railroads which are inefficient." *Ibid.* Chessie specifically asked the Commission to permit the expenditure of funds generated by the increases for any valid corporate purpose if the railroad had no deferred maintenance or deferred capital improvements as defined by the Commission's order. Chessie, for the first time, also argued that the Commission, "exceeded its statutory authority by conditioning the use to which the revenues derived from Ex parte No. 305 might be applied." *Id.*, at 226.

By order dated August 9, 1974, the Commission denied the petition for reconsideration but did significantly clarify its earlier orders. While reiterating its intention that the authorized increases, over and above the

increased costs of material and supplies, other than fuel, had to be used exclusively for reducing deferred maintenance of plant and equipment and delayed capital improvements, the Commission left "to the railroad managements' decision how the funds segregated in accordance with the July 18, 1974, order shall be applied to expenditures for the various specific items of equipment and other properties." Jurisdictional Statement 81a. The Commission pointed out that "the petition and verified statements of railroad officials seeking the increases authorized herein are replete with references to the need for revenues to provide funds for great, but unspecified, amounts of deferred maintenance and delayed capital improvements . . . ." *Id.*, at 81a–82a. The Commission did note that "certain railroads . . . may have anticipated authorization of the increases by initiating improvement projects, or scheduling or otherwise committing and recognizing them in capital budgets prior to June 1, 1974." *Id.*, at 82a. Under those circumstances, if the projects otherwise qualified as delayed capital improvements, the Commission stated that it would be "consistent with the Commission's intention that the authorized increases could be applied" to those projects. *Ibid.*

The present suit was commenced by Chessie on August 15, 1974. Chessie sought to set aside the June 3, July 18, and August 9 orders of the Commission. No other railroad joined in this action. On August 18, a single District Judge issued a temporary restraining order which prohibited the Commission from "enforcing the limiting conditions on the use of plaintiffs' revenues and of certain reporting conditions included in [the] Orders . . . ." App. 33.

On August 16, most of the country's railroads filed with the Commission another petition for clarification

and modification of its July 18 and August 9 orders. The Commission reopened the matter and held oral argument on August 27. Appellee Chessie System resisted appearing at this argument on the ground that its filing a complaint in the United States District Court deprived the Commission of further jurisdiction over it. The Commission, however, ordered that counsel representing the Chessie System be present at oral argument and be prepared to orally "show cause why any change should be made in the conditions and requirements contained in the outstanding orders in this proceeding." Jurisdictional Statement 91a–92a.

On October 3, the Commission concluded that if any railroad was "unable to use the full amount of the funds generated by the increase for deferred maintenance or delayed capital improvements" it might "expend such funds for new and additional capital improvements providing advance approval is obtained from the Commission . . . ." *Id.*, at 104a. Chessie amended its complaint in the District Court to challenge this order as well. It claimed that its maintenance and capital projects will not qualify as "new and additional capital improvement," App. 37, under the Commission's order since that order defined such projects as those "over and above those presently undertaken, scheduled or otherwise committed . . . ." *Id.*, at 38.

The District Court enjoined the Interstate Commerce Commission from enforcing against Chessie those portions of the challenged orders that required revenues derived from *Ex parte No. 305* to be spent for specified purposes. After rejecting the preliminary defenses raised by the Commission, the court concluded that the conditions imposed by the Commission on the expenditures of the increased revenues were unlawful. The

court began with the proposition that the Commission can impose conditions that have been expressly or impliedly authorized by law. It found, of course, no express authorization in the Interstate Commerce Act for the Commission to condition withholding suspension of a rate increase on how the additional revenue is spent. Examining the possibility of implied authority, the court noted that the Commission had not previously conditioned withholding the suspension of rates on control of a railroad's expenditures, and that, therefore, no court had considered the precise issue presented by this case. However, the District Court noted that it had been held, in other contexts, that the Commission lacks statutory authority to order the railroads how to spend their funds. *Missouri Pacific R. Co.* v. *Norwood,* 42 F. 2d 765 (WD Ark. 1930), aff'd, 283 U. S. 249 (1931); *ICC* v. *United States ex rel. Los Angeles,* 280 U. S. 52, 70 (1929). These cases, said the District Court, "unmistakenly establish that the Commission has no general power to control a railroad's expenditures. No provision of [49 U. S. C.] § 15 (7), authorizing suspension of rate increases, implies that the Commission may exercise, as an incident to suspension, the control over expenditures that Congress has otherwise withheld from it." 392 F. Supp., at 367. The court therefore concluded "that Congress has not authorized the Commission to control a carrier's expenditure of funds as a condition to withholding the suspension of rates." *Ibid.* We noted probable jurisdiction. 423 U. S. 923 (1975).

The precise question presented in this case, while one of first impression in this Court, is also a narrow one. In their application before the Commission, the railroads sought to justify the proposed general revenue increase on several grounds, including the need for additional funds for deferred capital and deferred maintenance ex-

penditures. We are confronted with the question of whether the Commission may, as a condition for not suspending and subsequently investigating the lawfulness of a proposed tariff, require the railroads to devote the additional revenues to a need which, they allege, justifies the increase.

The overall statutory mandate of the Commission in railroad ratemaking proceedings can, for present purposes, be stated quite simply. The Congress has charged the Commission with the task of determining whether the rates proposed by the carriers are "just and reasonable." 49 U. S. C. § 1 (5).[7] In fulfilling this obligation, the Commission must assess the proposed rates not only against the backdrop of the National Transportation Policy, 54 Stat. 899, 49 U. S. C. preceding § 1, but also with specific reference to the statutory criteria set forth by the Congress to guide the ratesetting process.[8] These provisions, in short, require the Commission to ensure that the rate imposed on the traveling or the shipping

---

[7] On February 5, 1976, while this case was pending, this section was amended by § 202 (a) of the Railroad Revitalization and Regulatory Reform Act of 1976, 90 Stat. 34. See Appendix to this opinion for text.

[8] Section 15a (2) of the Interstate Commerce Act, as added at 41 Stat. 488, and amended, 49 U. S. C. § 15a (2), provided:

"In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service."

This section has been amended by § 205 of the Railroad Revitalization and Regulatory Reform Act (n. 7, *supra*). See Appendix to this opinion for text.

public will support both an economically sound and efficient rail transportation system.

This Court has recently set out the regulatory scheme for the setting of railroad rates mandated by the Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. § 1 *et seq.* See *United States* v. *SCRAP,* 412 U. S. 669, 672–674 (1973). Rates, in the first instance, are set by the railroads. The proposed rate is filed with the Commission and notice is given to the public. After 30 days' notice (or a shorter period, if authorized by the ICC), the rate becomes effective. 49 U. S. C. § 6 (3). The Commission has the authority, during that 30-day period, to suspend the proposed tariff for a maximum of seven months in order to investigate the lawfulness of the new rates. 49 U. S. C. § 15 (7).[9] At the end of the seven-

---

[9] Section 15 (7) of the Interstate Commerce Act, 24 Stat. 384, as amended, 49 U. S. C. § 15 (7), provided:

"Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated

month suspension period, the proposed rate becomes effective unless the ICC has, prior to the deadline, completed the investigation and found that the rate is unlawful. See generally *Arrow Transportation Co. v. Southern R. Co.*, 372 U. S. 658 (1963). *Ex parte No. 305,* the proceeding at issue here, was a "general revenue proceeding." The railroads, while not seeking specific authority for an increase in the rate applicable to any particular commodity or group of commodities, proposed to increase the average rates charged.

The power to suspend the proposed rates pending investigation—the regulatory tool at issue here—was

after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible."

This section has been amended by § 202 (e) of the Railroad Revitalization and Regulatory Reform Act (n. 7, *supra*). See Appendix to this opinion for text.

added to the Interstate Commerce Act by the Mann-Elkins Act of 1910, 36 Stat. 552. Its purpose was to protect the public from the irreparable harm resulting in unjustified increases in transportation costs [10] by giving the Commission "full opportunity for . . . investigation" [11] *before* the tariff became effective. It provided a "means . . . for checking at the threshold new adjustments that might subsequently prove to be unreasonable or discriminatory, safeguarding the community against irreparable losses and recognizing more fully that the Commission's essential task is to establish and maintain reasonable charges and proper rate relationships." 1 I. Sharfman, The Interstate Commerce Commission 59 (1931). The exigencies of competition, seasonal and other demand trends, and the influences of the general economy over a seven-month period can make implementation of this suspension mechanism a particularly potent tool. That potency was well recognized, even at its creation. Senator Elkins referred to it as a "tremendous power." [12] Senator Cummins characterized it as "an order in the nature of a preliminary injunction," [13] a characterization later attributed to an almost identical statute. *Air Freight Forwarder Assn.,* 8 C. A. B. 469, 474 (1947).

The Commission's setting of this particular condition

---

[10] See, *e. g.,* S. Rep. No. 94–499, p. 13 (1975), on the recent Railroad Revitalization and Regulatory Reform Act, 90 Stat. 31: "Without suspension, the rate would go into effect and shippers would pass the added cost on to consumers. Upon a finding that a rate was unlawful, shippers could seek a refund, but no such remedy is available to consumers. Thus the power to suspend added an essential element to the Commission's ability to protect the public interest."

[11] 45 Cong. Rec. 3471 (1910) (statement of Sen. Elkins speaking on behalf of the majority report).

[12] *Ibid.*

[13] *Id.,* at 6500.

precedent to the immediate implementation of the rate increase was directly related to its mandate to assess the reasonableness of the rates and to suspend them pending investigation if there is a question as to their legality. The ICC could have simply suspended the rates originally proposed by the railroads for the full statutory seven-month period. Instead, it pursued a more measured course and offered an alternative tailored far more precisely to the particular circumstances presented. The railroads had made the representation that the increase was justified, at least in part, by the need to take care of deferred maintenance and deferred capital expenditures. If the railroads did, in fact, use the increased revenues for such purposes, the Commission perceived no reason to impose a suspension of the tariff or to undertake a lengthy investigation and, consequently, no reason to frustrate the clear congressional intent that "just and reasonable" rates be implemented. Delay through suspension would only have aggravated the already poor condition of some of the railroads. On the other hand, the Commission was cognizant of a history of poor financial planning by the railroads in regard to outlays of this nature. *Supra,* at 504 n. 4. If the revenues derived from the new tariffs, once received, were used for other purposes, an investigation prior to their implementation might indeed be warranted.

In upholding what we find to be a legitimate, reasonable, and direct adjunct to the Commission's explicit statutory power to suspend rates pending investigation, we do not imply that the Commission may involve itself in the financial management of the carriers. See *ICC* v. *United States ex rel. Los Angeles,* 280 U. S. 52 (1929). The action taken by the Commission here is both conceptually and functionally different from any attempt to

require specific management action, whether it be of a financial or operational nature; it specified no particular projects and it set no priorities. In deciding not to suspend the rates and investigate their lawfulness on the condition that the revenues be used in the broadly defined areas of "delayed capital improvements" and "deferred maintenance," the Commission simply held the railroads to their representation that the increase was justified by needs in these two areas. The railroads were, of course, not required to submit a tariff imposing such a condition on the use of the resulting revenue. They had the option to continue to insist on an unconditional increase, to submit proof of its reasonableness to the Commission, and, if successful, or if the investigation were not completed within the statutory seven-month period, to collect rates based on the new tariffs.

In this Court, Chessie has argued that its particular financial situation makes it unable to use *Ex parte No. 305* revenues and, consequently, the application of the Commission's action to it is arbitrary and capricious. The Commission, on the other hand, submits that there is sufficient evidence in the proceedings before it to demonstrate that Chessie did in fact have deferred maintenance items upon which these revenues could be expended. Moreover, the Commission points out that Chessie was not required to join the other railroads in the cancellation of the original tariff and the refiling of the one conditioned on the use of revenues in these two areas. Since the District Court held that the Commission did not have the power to impose conditions on the refiling of the tariff, it did not address this question. Chessie, if it so chooses, may raise the matter on remand in the District Court.

Accordingly, the judgment is reversed, and the case is

remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

Mr. Justice Powell took no part in the consideration or decision of this case.

## APPENDIX TO OPINION OF THE COURT

Selected Sections of the Railroad Revitalization and Regulatory Reform Act, Pub. L. No. 94–210, 90 Stat. 31:

Sec. 202. (a) Section 1 (5) of the Interstate Commerce Act (49 U. S. C. 1 (5)) is amended by inserting "(a)" immediately after "(5)" and by adding at the end thereof the following new sentence: "The provisions of this subdivision shall not apply to common carriers by railroad subject to this part."

(b) Section 1 (5) of the Interstate Commerce Act (49 U. S. C. 1 (5)), as amended by subsection (a) of this section, is further amended by adding at the end thereof the following new subdivisions:

"(b) Each rate for any service rendered or to be rendered in the transportation of persons or property by any common carrier by railroad subject to this part shall be just and reasonable. A rate that is unjust or unreasonable is prohibited and unlawful. No rate which contributes or which would contribute to the going concern value of such a carrier shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate is below a just or reasonable minimum for the service rendered or to be rendered. A rate which equals or exceeds the variable costs (as determined through formulas prescribed by the Commission) of providing a service shall be presumed, unless such presumption is rebutted by clear and convincing evidence, to contribute to the going concern value of the carrier or carriers proposing such rate (hereafter in this paragraph referred to as the 'proponent carrier'). In determining variable costs, the Commission shall, at the request of the carrier proposing the rate, determine only those costs of the carrier proposing the rate and only those costs of the specific service in question, except where such specific data and cost information is not available. The Commission shall not include in variable cost any expenses which do not vary directly with the level of service provided under the rate in question. Notwithstanding any other provision of this part, no rate shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that

such rate exceeds a just or reasonable maximum for the service rendered or to be rendered, unless the Commission has first found that the proponent carrier has market dominance over such service. A finding that a carrier has market dominance over a service shall not create a presumption that the rate or rates for such service exceed a just and reasonable maximum. Nothing in this paragraph shall prohibit a rate increase from a level which reduces the going concern value of the proponent carrier to a level which contributes to such going concern value and is otherwise just and reasonable. For the purposes of the preceding sentence, a rate increase which does not raise a rate above the incremental costs (as determined through formulas prescribed by the Commission) of rendering the service to which such rate applies shall be presumed to be just and reasonable.

"(c) As used in this part, the terms—

"(i) 'market dominance' refers to an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies; and

"(ii) 'rate' means any rate or charge for the transportation of persons or property.

"(d) Within 240 days after the date of enactment of this subdivision, the Commission shall establish, by rule, standards and procedures for determining, in accordance with section 15 (9) of this part, whether and when a carrier possesses market dominance over a service rendered or to be rendered at a particular rate or rates. Such rules shall be designed to provide for a practical determination without administrative delay. The Commission shall solicit and consider the recommendations of the Attorney General and of the Federal Trade Commission in the course of establishing such rules."

.        .        .        .        .

(e) Section 15 of the Interstate Commerce Act (49 U. S. C. 15), as amended by this Act, is further amended—

(1) by adding at the end of paragraph (7) thereof the following new sentence: "This paragraph shall not apply to common carriers by railroad subject to this part."; and

(2) by inserting a new paragraph (8) as follows:

"(8) (a) Whenever a schedule is filed with the Commission by a common carrier by railroad stating a new individual or joint rate, fare, or charge, or a new individual or joint classification, regulation, or practice affecting a rate, fare, or charge, the Commission may, upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of such rate, fare, charge,

classification, regulation, or practice. The hearing may be conducted without answer or other formal pleading, but reasonable notice shall be provided to interested parties. Such hearing shall be completed and a final decision rendered by the Commission not later than 7 months after such rate, fare, charge, classification, regulation, or practice was scheduled to become effective, unless, prior to the expiration of such 7-month period, the Commission reports in writing to the Congress that it is unable to render a decision within such period, together with a full explanation of the reason for the delay. If such a report is made to the Congress, the final decision shall be made not later than 10 months after the date of the filing of such schedule. If the final decision of the Commission is not made within the applicable time period, the rate, fare, charge, classification, regulation, or practice shall go into effect immediately at the expiration of such time period, or shall remain in effect if it has already become effective. Such rate, fare, charge, classification, regulation, or practice may be set aside thereafter by the Commission if, upon complaint of an interested party, the Commission finds it to be unlawful.

"(b) Pending a hearing pursuant to subdivision (a), the schedule may be suspended, pursuant to subdivision (d), for 7 months beyond the time when it would otherwise go into effect, or for 10 months if the Commission makes a report to the Congress pursuant to subdivision (a), except under the following conditions:

"(i) in the case of a rate increase, a rate may not be suspended on the ground that it exceeds a just and reasonable level if the rate is within a limit specified in subdivision (c), except that such a rate change may be suspended under any provision of section 2, 3, or 4 of this part or, following promulgation of standards and procedures under section 1 (5) (d) of this part, if the carrier is found to have market dominance, within the meaning of section 1 (5) (c) (i) of this part, over the service to which such rate increase applies; or

"(ii) in the case of a rate decrease, a rate may not be suspended on the ground that it is below a just and reasonable level if the rate is within a limit specified in subdivision (c), except that such a rate change may be suspended under any provision of section 2, 3, or 4 of this part, or for the purposes of investigating such rate change upon a complaint that such rate change constitutes a competitive practice which is unfair, destructive, predatory or otherwise undermines competition which is necessary in the public interest.

"(c) The limitations upon the Commission's power to suspend rate

changes set forth in subdivisions (b)(i) and (ii) apply only to rate changes which are not of general applicability to all or substantially all classes of traffic and only if—

"(i) the rate increase or decrease is filed within 2 years after the date of the enactment of this subdivision;

"(ii) the common carrier by railroad notifies the Commission that it wishes to have the rate considered pursuant to this subdivision;

"(iii) the aggregate of increases or decreases in any rate filed pursuant to clauses (i) and (ii) of this subdivision within the first 365 days following such date of enactment is not more than 7 per centum of the rate in effect on January 1, 1976; and

"(iv) the aggregate of the increases or decreases for any rate filed pursuant to clauses (i) and (ii) of this subdivision within the second 365 day-period following such date of enactment is not more than 7 per centum of the rate in effect on January 1, 1977.

"(d) The Commission may not suspend a rate under this paragraph unless it appears from specific facts shown by the verified complaint of any person that—

"(i) without suspension the proposed rate change will cause substantial injury to the complainant or the party represented by such complainant; and

"(ii) it is likely that such complainant will prevail on the merits. The burden of proof shall be upon the complainant to establish the matters set forth in clauses (i) and (ii) of this subdivision. Nothing in this paragraph shall be construed as establishing a presumption that any rate increase or decrease in excess of the limits set forth in clauses (iii) or (iv) of subdivision (c) is unlawful or should be suspended.

"(e) If a hearing is initiated under this paragraph with respect to a proposed increased rate, fare, or charge, and if the schedule is not suspended pending such hearing and the decision thereon, the Commission shall require the railroads involved to keep an account of all amounts received because of such increase from the date such rate, fare, or charge became effective until the Commission issues an order or until 7 months after such date, whichever first occurs, or, if the hearings are extended pursuant to subdivision (a), until an order issues or until 10 months elapse, whichever first occurs. The account shall specify by whom and on whose behalf the amounts are paid. In its final order, the Commission shall require the common carrier by railroad to refund to the person on whose behalf the amounts were paid that portion of such increased rate, fare, or charge found to be not justified, plus interest at a rate which is

equal to the average yield (on the date such schedule is filed) of marketable securities of the United States which have a duration of 90 days. With respect to any proposed decreased rate, fare, or charge which is suspended, if the decrease or any part thereof is ultimately found to be lawful, the common carrier by railroad may refund any part of the portion of such decreased rate, fare, or charge found justified if such carrier makes such a refund available on an equal basis to all shippers who participated in such rate, fare, or charge according to the relative amounts of traffic shipped at such rate, fare, or charge.

"(f) In any hearing under this section, the burden of proof is on the common carrier by railroad to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable. The Commission shall specifically consider, in any such hearing, proof that such proposed changed rate, fare, charge, classification, rule, regulation, or practice will have a significantly adverse effect (in violation of section 2 or 3 of this part) on the competitive posture of shippers or consignees affected thereby. The Commission shall give such hearing and decision preference over all other matters relating to railroads pending before the Commission and shall make its decision at the earliest practicable time."

SEC. 205. Section 15a of the Interstate Commerce Act (49 U. S. C. 15a) is amended—

(1) by adding at the end of paragraph (2) and at the end of paragraph (3) the following new sentence: "This paragraph shall not apply to common carriers by railroad subject to this part."; and

(2) by redesignating paragraph (4) as paragraph (6), and by inserting immediately after paragraph (3) the following new paragraph:

"(4) With respect to common carriers by railroad, the Commission shall, within 24 months after the date of enactment of this paragraph, after notice and an opportunity for a hearing, develop and promulgate (and thereafter revise and maintain) reasonable standards and procedures for the establishment of revenue levels adequate under honest, economical, and efficient management to cover total operating expenses, including depreciation and obsolescence, plus a fair, reasonable, and economic profit or return (or both) on capital employed in the business. Such revenue levels should (a) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a rea-

sonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation and (b) insure retention and attraction of capital in amounts adequate to provide a sound transportation system in the United States. The Commission shall make an adequate and continuing effort to assist such carriers in attaining such revenue levels. No rate of a common carrier by railroad shall be held up to a particular level to protect the traffic of any other carrier or mode of transportation, unless the Commission finds that such rate reduces or would reduce the going concern value of the carrier charging the rate."

MR. JUSTICE STEVENS, with whom MR. JUSTICE STEWART joins, dissenting.

The question presented is not whether it is desirable for a railroad to spend its money wisely. It clearly is. The question is not whether Congress could authorize the Interstate Commerce Commission to regulate a railroad's expenditure of funds for capital improvements, deferred maintenance, or costs of material. It clearly could. The question is simply whether or to what extent Congress did grant the Commission such authority.[1]

If the power the Commission purports to exercise in this case really exists, it is rather surprising that it has lain dormant for so long and has been disavowed so often.[2] Nowhere in the voluminous statutory language

[1] Cf. *NAACP* v. *FPC*, 425 U. S. 662, 665. See also *id.*, at 673–674 (BURGER, C. J., concurring in judgment) (emphasizing the need for caution before concluding that Congress authorized the Federal Power Commission to regulate business practices not previously regulated by that agency).

[2] As recently as 1971, the Commission disavowed precisely the position it has taken in this case. Referring to a report finding a need for the railroads to double their expenditures for equipment and facilities, the Commission stated:

"The development of capital for investments of the type recommended in this report remains the function of management and is not a measure of the reasonableness of rate levels. It is to be hoped that the earning capacity of the carriers will be such as to

quoted by the Court can I find an authorization to the Commission to impose direct regulatory controls on a railroad's expenditures. Nor is there any precedent for this action in either the Commission's decisions, see n. 2, *supra,* or in the decisions of this Court. Quite the contrary, the holdings in *ICC* v. *United States ex rel. Los Angeles,* 280 U. S. 52, that the Commission lacked power to compel the railroads to construct a new passenger station, and in *United States* v. *Pennsylvania R. Co.,* 242 U. S. 208, that the Commission could not order a railroad to furnish tank cars for shipping oil, imply that the Commission possesses no such power.[3]

---

enable them to command adequate investment money on either a debt or equity basis. *That capacity, however, has reference to their individual management and concerns a problem distinct from the lawfulness of their rates." Ex parte No. 265,* Increased Freight Rates, 1970 and 1971, 339 I. C. C. 125, 180–181 (1971) (emphasis added).

The Commission has repeatedly disavowed any general power to require railroads to purchase and maintain sufficient equipment for adequate service. *Duralite Co., Inc.* v. *Erie Lackawanna R. Co.,* 339 I. C. C. 312, 314 (1971); *Adequacies—Passenger Service— Southern Pac. Co.,* 335 I. C. C. 415, 423–425 (1969); *Oliver Mfg. Supply Co.* v. *Reading R. Co.,* 297 I. C. C. 654, 658 (1956); *Jacksonville Port Terminal Operators Assn.* v. *Alabama, T. & N. R. Co.,* 263 I. C. C. 111, 116 (1945); *Joseph A. Goddard Realty Co.* v. *New York, C. & St. L. R. Co.,* 229 I. C. C. 497, 502 (1938). The Commission has made the same representation to Congress. ICC 86th Annual Report 23 (1972); ICC 84th Annual Report 9 (1970); ICC 70th Annual Report 83 (1956).

[3] The Court distinguishes *Los Angeles* and presumably *Pennsylvania R. Co.* as well on the grounds (a) that the Commission has conditioned the rate increase only upon expenditures in the broad categories of "delayed capital improvements" and "deferred maintenance," (b) that the railroads themselves represented that they needed the increase for such expenditures, and (c) that the Commission only exercised its suspension powers and the railroads remained free to seek a general rate increase. *Ante,* at 514–515. The second and third reasons are discussed *infra,* at 523–525, and n. 6. The first

If the Commission may not impose such regulation directly, it is equally impermissible for it to do so indirectly by attaching conditions to its approval of rate increases.[4] For periodic rate adjustments are inevitable in response to the ever-present pressures of economic change and it is almost equally inevitable that carriers will assert all available grounds in support of such adjustments. The petition in the present case sought to justify the increase for a variety of overlapping reasons: the increased cost of wages, fuel, and materials; increased interest rates; the decreased access of railroads to capital markets; the need to prevent deterioration of existing equipment; the need to modernize and expand capacity

---

is plainly insufficient, for administrative intrusion into managerial decisionmaking does not decrease as the scope of the decision increases. In this case, the intrusion is great precisely *because* the decision is general: whether to allocate an increase in revenues to operating expenses, to deferred capital and maintenance expenditures, or to other purposes. For the Chessie, the increased revenues at stake are approximately $29.7 million for the first three quarters of 1975. App. 346, 357, 368, 379, 390, 401, 412, 423, 434. Nationwide, the Commission estimated that a 10% increase would produce a $1.5 billion increase in annual revenues for the industry, of which 70%, less increased income taxes, is subject to the disputed condition. *Ex parte No. 305,* Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974; Orders of Apr. 30, 1974, May 3, 1974, and July 18, 1974; Jurisdictional Statement 28a, 33a, 59a.

[4] An order allowing a rate increase subject to a condition is in no sense equivalent to an order allowing a rate increase without conditions but upon a finding that the increase is needed for only one purpose. In the former case, the condition may be enforced by actions for injunctions and forfeitures. 49 U. S. C. §§ 16 (7)–(9), (12). In the latter, the railroad could not be forced to rescind the rate increase without a full hearing to determine whether its rates were "unjust or unreasonable." 49 U. S. C. § 15 (1). By itself, I would think proof that the increased revenue had been expended for other purposes would be insufficient to show that the increased rates were "unjust or unreasonable," at least in the absence of intentional misrepresentation in the prior rate increase proceedings.

to meet increased demand; the disparity between the rate of inflation and past increases in railroad rates.[5] Any one of these justifications could, on the Court's rationale, furnish the predicate for Commission regulation of decisions heretofore regarded as the prerogative of railroad management. The Commission's power to work its will in the form of conditional approvals, if valid, is only slightly less pervasive than the power to regulate affirmatively.[6]

Nor do I believe the Commission's action can be supported as an exercise of some sort of inherent equitable power to order specific performance by the Chessie of a commitment it has made. The description of industry conditions in the petition for the general rate increase was entirely accurate. It did not purport to describe the condition of each railroad in the country. The revenue needs of financially sound railroads, like the Chessie, are vastly different from those of bankrupt and near-bankrupt lines.[7] General rate increase proceedings are not principally concerned with the revenue needs of particular railroads but serve the quite different purpose of determining whether an increase is appropriate on an industrywide or an areawide basis. As this Court recognized in *United States* v. *Louisiana*, 290

---

[5] *Ex parte No. 305, supra;* App. 101–119.

[6] The Commission's suspension power, upon which the Court relies, *ante,* at 512–515, is an equally insufficient predicate for the exercise of control over expenditures. Since the Commission cannot impose the condition in the exercise of its ratemaking powers, it cannot accomplish the same result by suspending the rate increase to coerce the railroads into "consenting" to the condition by submitting a tariff to that effect.

[7] One railroad represented that it needed the increase in order to meet payrolls and another that it needed the increase to accelerate a bankruptcy reorganization program. *Ex parte No. 305, supra;* App. 109–110, 112.

U. S. 70, general rate increase proceedings would prove impossible "if instead of adjudicating upon the rates in a large territory on evidence deemed typical of the whole rate structure, [the Commission] were obliged to consider the reasonableness of each individual rate before carrying into effect the necessary increased schedule." *Id.*, at 75–76. The primary concern must be with industrywide or areawide economic conditions, not with the financial condition of particular carriers. Indeed, the petition for a general rate increase in this case did not contain any representations specifically addressed to the financial condition of the Chessie and the attached schedules contained financial statements of the Chessie of unchallenged accuracy.[8] There was no misdescription of the industry and there was no misdescription of the Chessie.

But even if the petition had misrepresented the prosperous financial condition of the Chessie, the proper remedy would have been to suspend the rate increase as it applied to the Chessie.[9] The reason the Commission did not take this step is that it would have forced competing railroads to lower their rates and hence would have denied them the increased revenues they need to make improvements.[10] Thus, the Commision's position is not

---

[8] *Ex parte No. 305, supra,* and Schedules A and B; App. 95–124, 142–154.

[9] The broad language of §§ 15 and 15a of the Interstate Commerce Act, both before and after their recent amendments, contemplates suspension and regulation of rates of individual carriers. See *ante,* at 510–512, nn. 8, 9, and *ante,* at 517–521.

[10] The Commission has candidly stated its reasons for not suspending the rate increase with respect to individual railroads:

"In theory the Commission could discipline a railroad that misled it about the uses to which it would put revenues collected only with the Commission's permission by reducing that line's rates and requiring it to make refunds. But because the railroads compete with

that conditional rate increases are necessary to maintain the integrity of the ratemaking process, but rather that they are necessary for either of two very different purposes: to prevent strong railroads from making excess profits at the rates necessary to provide a reasonable return to weak railroads;[11] or to protect weak railroads from competition at the lower rates that would otherwise be imposed on strong railroads.[12]

Section 15a of the Interstate Commerce Act once contained a provision that served precisely these purposes. The Transportation Act of 1920, 41 Stat. 456, added to § 15a a "Recapture Clause," which applied to "net railway operating income substantially and unreasonably in excess of a fair return upon the value of . . . railway property held for and used in the service of transportation." § 422, 41 Stat. 489. The Recapture Clause required that one-half the excess revenues be paid to the Commission and placed in a special fund for loans to less prosperous railroads and that the remainder be kept by the railroad in a special reserve fund that

each other (freight usually can be sent over two or more lines using different routes to reach the same destination), if the Commission ordered an offending railroad to reduce its rates other lines would be compelled to follow suit and would themselves be deprived of the funds they need to make improvements." Brief for Appellants 22.

[11] I do not mean to express the opinion that Chessie's profits would be excessive at the increased rate.

[12] The Commission's position is in fact somewhat broader: Any railroad that failed to make deferred capital and maintenance expenditures in the appropriate amounts, but charged the full increased rate, would receive an unjust and unreasonable rate. *Ex parte No. 305, supra;* Order of June 3, 1974; Jurisdictional Statement 42a–43a. Consequently, the condition was necessary either to prevent all such railroads from receiving an unreasonable return, or to avoid imposing a lower rate on such railroads and thus putting competitive pressure on the railroads that do make the prescribed expenditures.

could be used only for purposes specified in the statute. 41 Stat. 489–491. Together with the provision in the 1920 Act that first authorized general rate proceedings, 41 Stat. 488, the Recapture Clause permitted the Commission to prevent strong railroads from making excess profits while enabling it to set general rates high enough to give weak railroads a reasonable return.[13] However, the Recapture Clause was repealed, and the excess revenues fund redistributed, by the Emergency Railroad Transportation Act, 1933, §§ 205, 206, 48 Stat. 220. The repeal was in part attributable to the economic distress of the railroads during the Great Depression, but Congress was also impressed by reasons of a more permanent character. The House Committee on Interstate and Foreign Commerce reported the repealer favorably, relying on the following testimony of the chairman of the legislative committee of the Interstate Commerce Commission:

> " 'There is something incongruous in a system of regulation which finds it necessary to permit carriers to earn more than they ought to earn, and meets the difficulty by taking money away after

---

[13] The language of the Recapture Clause stated as much:

"(5) Inasmuch as it is impossible (without regulation and control in the interest of the commerce of the United States considered as a whole) to establish uniform rates upon competitive traffic which will adequately sustain all the carriers which are engaged in such traffic and which are indispensable to the communities to which they render the service of transportation, without enabling some of such carriers to receive a net railway operating income substantially and unreasonably in excess of a fair return upon the value of their railway property held for and used in the service of transportation, it is hereby declared that any carrier which receives such an income so in excess of a fair return, shall hold such part of the excess, as hereinafter prescribed, as trustee for, and shall pay it to, the United States." 41 Stat. 489.

it is received.' " H. R. Rep. No. 193, 73d Cong., 1st Sess., 30 (1933).

The parallel with what the Commission has purported to do in the present case—permit the Chessie to earn more than it should but forbid expenditure of the excess—is striking. The only difference is that the Commission asserts this power without express authorization, relying instead upon its broad power to prescribe "just and reasonable rates" under § 15a (2) of the Interstate Commerce Act, as it read before its recent amendment.[14] Ironically, that provision was enacted by the same section of the same Act that repealed the Recapture Clause, § 205 of the Emergency Railroad Transportation Act, 1933, 48 Stat. 220. It is doubtful that Congress would have used the general language of former § 15a (2) to confer, by implication, a broader power than it had previously granted in express terms and with specific limitations in the Recapture Clause. It is inconceivable that it intended to do so in the same section of the same Act that repealed the Recapture Clause.

I would affirm the judgment of the District Court.

---

[14] See *ante,* at 510 n. 8.