**AMOSKEAG COMPANY et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**and**

**Maine Central Railroad Co., Intervenor.**

**No. 78–1049.**

United States Court of Appeals, First Circuit.

Argued Oct. 6, 1978.

Decided Jan. 16, 1979.

John E. Haley, Washington, D. C., with whom Peter J. Vaghi, Sidley & Austin, Washington, D. C., Alan L. Lefkowitz, Edward T. Robinson, Paul E. Clifford, James D. McGinley, and Gaston Snow & Ely Bartlett, Boston, Mass., were on brief, for petitioners.

Jerome Nelson, Atty., I. C. C., with whom Robert S. Burk, Deputy Gen. Counsel, and Henri E. Rush, Associate Gen. Counsel, Washington, D. C., were on brief, for the I. C. C.

Peter J. Nickles, Washington, D. C., with whom Eugene D. Gulland, and Covington & Burling, Washington,. D. C., were on brief, for intervenor.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

On December 12, 1977, the Interstate Commerce Commission entered a cease and desist order against Amoskeag Company's tender offer (through its wholly-owned subsidiary, Downeast Management Corporation) to purchase Maine Central Railroad Company stock. Amoskeag appeals that order to us.

## BACKGROUND

Amoskeag acquired control of the Bangor & Aroostook Railroad by purchasing 97% of its outstanding common stock in 1969. At the time, Amoskeag was the largest shareholder in Maine Central, having purchased 26% of its stock in 1965. In late 1973 and early 1974, Amoskeag increased its ownership in Maine Central to 34%. Amoskeag placed the stock in an independent voting trust, which is now held by the Mercantile

Trust Company, N. A., of St. Louis, Missouri.

The provisions of the Interstate Commerce Act, 49 U.S.C. § 5(2), (5),[1] make it illegal for a company to control two common carriers without prior approval from the Commission. In April, 1974, Maine Central filed a complaint with the ICC contending that Amoskeag illegally had obtained control over Maine Central, in violation of 49 U.S.C. § 5(5).[2] Also in April, 1974, Amoskeag had filed for permission with the Commission to vote directly its Maine Central stock and for Commission approval to purchase additional stock in it so as to enable Amoskeag to effectuate control over Maine Central. Amoskeag indicated it would later seek Commission approval to join under common management the Maine Central and the Bangor & Aroostook. It maintained that substantial operating savings and improved service to the public would be realized by so joining the two railroads. The lines of the two companies run end to end, connecting outside Bangor, Maine.

Throughout this period, and apparently starting sometime following the initial 1965 purchase by Amoskeag of 26% of Maine Central stock (which had been with the blessing and active encouragement of Maine Central management), the management of Maine Central determined that it would oppose the takeover plans of Amoskeag. Preliminary skirmishes took place and, finally, in June, 1976, the administrative law judge ruled that Amoskeag's application, filed in April, 1974, would be limited to an application to vote the 34% stock already owned by Amoskeag. The ALJ ruled that the request to purchase additional stock lacked sufficient specificity as required by 49 C.F.R. § 1111.1 et seq. The administrative law judge had previously ruled, in May, 1976, that Amoskeag would not be permitted to amend its original application so as to provide the specific means by which it intended to purchase the additional stock. Amoskeag thus found itself in the position whereby its April, 1974, application was limited to one seeking solely the power to vote currently owned stock. It was denied permission to purchase additional Maine Central stock. During the Spring of 1974, and at intervals thereafter, Amoskeag, through counsel, gave its oral and written commitment that it would refrain from any further purchase of Maine Central stock without prior Commission approval. This commitment was alternately phrased in terms of not acting without prior Commission approval and in terms of not acting except in conjunction with a procedure satisfactory to the Commission. There is no gainsaying that the commitment was a voluntary one, proffered by Amoskeag because of the section 5(5) complaint, 49 U.S.C. § 5(5), which had been earlier lodged by Maine Central. Amoskeag stated that, during the pendency of the Commission's proceedings, it wished to avoid even the

1. On October 17, 1978, Congress passed a comprehensive revision of the Interstate Commerce Act. The revised Act is not intended as a substantive change, but rather a restatement, in comprehensive form, of the prior Act and related laws. H.R.Rep.No.95–1395, 95th Cong., 2d Sess. 7. The newly codified sections under discussion can be found at 49 U.S.C. §§ 11343–11346, 11701, Pub.L.No.95–473 (Oct. 17, 1978). Throughout this opinion, we will retain reference to the Act as it appeared prior to its recent revision.

2. That section reads as follows:

"§ 5, par. (5). *Control effected by other than prescribed methods.* It shall be unlawful for any person, except as provided in paragraphs (2) and (3) of this section, to enter into any transaction within the scope of subdivision (a) of paragraph (2) of this section, or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after the enactment of this amendatory paragraph and in violation of its provisions. As used in this paragraph and paragraph (6) of this section, the words 'control or management' shall be construed to include the power to exercise control or management. As amended Feb. 5, 1976, Pub.L. 94–210, Title IV, § 403(a), (b)(3), (9), 90 Stat. 63, 65, 66."

appearance of illegal control and so would purchase no further stock without ICC approval. The section 5(5) complaint has been subsequently determined adversely to Maine Central: an administrative law judge ruled that Amoskeag's purchase of the 34% stock had not resulted in unlawful control of Maine Central. An appeal has been taken by Maine Central of this decision.

On December 5, 1977, Amoskeag, through its wholly-owned subsidiary, Downeast Management, made a tender offer to purchase an additional 18% of outstanding Maine Central stock. The stock would be placed in an independent voting trust, held by the Riggs Bank. The tender offer included a letter to the ICC indicating that Amoskeag felt that the separate, independent voting trust to be established with the Riggs Bank, would, in its opinion, satisfy Commission requirements for avoiding a possible section 5(5), 49 U.S.C. § 5(5), violation. Amoskeag cited the Commission's proposed rulemaking *Ex Parte 332*, 42 Fed. Reg. 39243 (1977), which had been issued on August 3, 1977, as indicating that the placing of shares in a voting trust with an independent voting trustee would effectively safeguard against a violation of 49 U.S.C. § 5(5).[3]

At the hearing before the administrative law judge on December 7, 1977, Amoskeag repeated its position that it thought the tender offer with the new independent voting trust satisfied its commitment not to purchase additional Maine Central stock without prior approval from the Commission. The ALJ disagreed and entered a cease and desist order against the tender

offer. The full Commission upheld the administrative law judge on December 12, 1977.

The grounds for the Commission's order were: (1) the commitment by Amoskeag not to purchase additional Maine Central stock without first obtaining Commission approval would be enforced; (2) Amoskeag had violated the proposed Commission policy requiring advance approval of voting trusts; (3) further purchases of Maine Central stock would create the "substantial likelihood" of violations of the Interstate Commerce Act, 49 U.S.C. §§ 5(2) and (5).

## PROPRIETY OF THE CEASE AND DESIST ORDER

Amoskeag raises several objections to the cease and desist order, beginning with the proposition that the Commission was not empowered in this instance to issue said order. Amoskeag also alleges that it did not have the required notice of such an order and that the hearing at which the ALJ entered the order was inadequate to protect its interests.

We deal first with the challenge to the authority of the Commission to enter a cease and desist order. Amoskeag contends that since the Commission did not find an actual violation, but only a likelihood of a violation were the tender offer to proceed, it lacked the statutory authority to enter the cease and desist order. Amoskeag claims that the Commission does not enjoy traditional equity powers, but rather only those powers specifically delegated to it by Congress.[4]

---

**3.** The preface to the proposed rules states: "This section of the Act does not preclude the use of voting trusts in proceedings wherein the acquisition of control or management was obtained without prior Commission approval, because it has been determined in several cases decided by Federal courts, 'that creation of an independent voting trust for stock, the prior control of which without Commission approval constituted a section 5(4) [now section 5(5)] violation was effective to avoid the violation and the Commission was authorized to give it that effect' (emphasis added). *B. F. Goodrich Co. v Northwest Industries, Inc.*, 303 F.Supp.

53, 61 (D.Del.1969), aff'd 424 F.2d 1349 (3rd Cir. 1970), cert. denied, 400 U.S. 822 [91 S.Ct. 41, 27 L.Ed.2d 50] (1971). This and other decisions make it clear that the wording of Section 5(5) of the Act does not prohibit voting trusts so long as the trustee is truly independent of the acquiring carrier settlor. See, *Illinois Central R.R. Co. v. United States*, 293 [263] F.Supp. 421–429 (N.D.Ill.1966), affirmed per curiam, 385 U.S. 457 [87 S.Ct. 612, 17 L.Ed.2d 509] (1967)." 42 Fed.Reg. 39243 (1977) (footnote omitted).

**4.** A hearing was held on December 13, 1977, before the district court in Maine, at which

Under the Act, the Commission is empowered

upon complaint or upon its own initiative without complaint, but after notice and hearing, to investigate and determine whether any person is violating the provisions of paragraph (5) of this section. If the Commission finds after such investigation that such person *is violating the provisions of such paragraph*, it shall by order require such person to take such action as may be necessary, in the opinion of the Commission, to prevent continuance of such violation. The provisions of this paragraph shall be in addition to, and not in substitution for, any other enforcement provisions contained in this chapter [.] (emphasis added).

49 U.S.C. § 5(8). Amoskeag urges a literal reading of this statute to the end that, since the Commission found only that the tender offer, if consummated, would have a "substantial likelihood" of resulting in a violation of 49 U.S.C. § 5(5), it could not enter the cease and desist order. We do not cavil with Amoskeag's observation that the Commission is without authority to exercise power not entrusted to it by Congress. We do, however, quarrel with the suggestion that an explicit grant of power must underpin each such exercise. *See, e. g., Permian Basin Area Rate Cases,* 390 U.S. 747, 780, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *American Trucking Associations, Inc. v. United States,* 344 U.S. 298, 312, 73 S.Ct. 307, 97 L.Ed. 337 (1953). *See generally* K. Davis,

Administrative Law Treatise §§ 3.1–3.9 (2d ed. 1978). The Supreme Court underscored the broad regulatory authority which reposes in the Interstate Commerce Commission, stating "[s]ection 5(4) [section 5(5) under the Act as amended February 5, 1976, Pub.L. 94–210, Title IV, § 403(a), (b)(4)] is part of a comprehensive legislative scheme designed to place ownership, management, and operational control over common carriers within the regulatory jurisdiction of the Commission." *Gilbertville Trucking Co., Inc. v. United States,* 371 U.S. 115, 122, 83 S.Ct. 217, 222, 9 L.Ed.2d 177 (1962). *See generally,* 49 U.S.C. § 5(2), (5).

In this case, the Commission was faced with three issues: a broken commitment by Amoskeag; a perceived threat of a violation of section 5(5) of the Act, 49 U.S.C. § 5(5); Amoskeag's failure to secure approval for the new proposed voting trust, as required by proposed Commission regulations.

It would be anomalous indeed if parties could commit themselves to a certain course of action, so as to obtain advantages then viewed as desirable, then later, at their option, decide not to honor the commitment. This is what we face here. Amoskeag committed *itself* on at least six occasions *not to* purchase the Maine Central stock without prior Commission approval.[5] As a result of this promise, certain benefits accrued, including the right to obtain the names of Maine Central's stockholders.[6] The Com-

---

time the court indicated that it would grant injunctive relief necessary to enforce the Commission order. Faced with this prospect, Amoskeag notified the court that it would withdraw the tender offer the following day, in compliance with the Commission order. Amoskeag's suggestion that the Commission arrogated to itself the judicial function of entering interlocutory injunctive relief is thus blunted: the district court clearly indicated that it was prepared to enter the very relief which had been granted by the Commission.

**5.** Amoskeag informed the Securities and Exchange Commission, the General Counsel of the Interstate Commerce Commission and an administrative law judge of the ICC, and counsel for Maine Central that it would refrain from any purchase of Maine Central stock without prior Commission approval. These assurances

were made during the period May, 1974, through June, 1976. In October, 1977, in anticipation of the December 7, 1977, hearing before the Commission, Maine Central agreed to a request for an updated list of shareholders from Amoskeag, clearly noting that it was complying on the understanding that Amoskeag's previously made commitment not to purchase any stock without Commission approval remained in effect. Amoskeag accepted the list without objecting in any way to Maine Central's qualification.

**6.** Amoskeag contends, and we have no reason to believe otherwise, that it did not use the lists obtained for purposes of obtaining additional stock. Amoskeag had been allowed access to the lists based on its commitment not to use the lists to obtain further stock of Maine Central.

mission, in issuing the cease and desist order "simply held [Amoskeag] to [its] representation," *United States v. Chesapeake & Ohio Ry. Co.*, 426 U.S. 500, 515, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976), not to purchase stock without prior approval. We cannot say what course of action the Commission or Maine Central might have taken had they not received the assurances from Amoskeag, and we are not inclined to speculate. Amoskeag's commitment, coupled with its failure to observe proposed Commission rules requiring prior approval of independent voting trusts, are sufficient bases for the Commission's acting to protect the integrity of its jurisdiction. *See Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 652, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978); *United States v. Chesapeake & Ohio Ry. Co., supra*, 426 U.S. at 514, 96 S.Ct. 2318; *FTC v. Dean Foods Co.*, 384 U.S. 597, 607, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966); *Admiral-Merchants Motor Freight, Inc. v. United States*, 321 F.Supp. 353, 357 (D.Colo.) (three-judge court), *aff'd per curiam*, 404 U.S. 802, 92 S.Ct. 51, 30 L.Ed. 37 (1971). *See also* 49 U.S.C. § 5(12).

■ Amoskeag claims that the entry of the cease and desist order was incorrect since factual issues remained in contention. This claim is not warranted by a review of the record. The facts upon which the administrative law judge and later the Commission rested in issuing the order were clear and undisputed. The interpretation to be given the facts was properly for the ALJ and the Commission; our review is limited to a determination of whether substantial evidence supports those conclusions. *Illinois Central R.R. Co. v. Norfolk & Western*

*Ry. Co.*, 385 U.S. 57, 66, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Bangor & Aroostook Ry. Co. v. ICC*, 574 F.2d 1096, 1108 (1st Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978).

The record adequately documents Amoskeag's oft-repeated commitment not to purchase additional Maine Central stock without prior Commission approval. The record also shows that Amoskeag did not seek approval of its new proposed independent voting trust in advance of making the tender offer, as would be required under the proposed rulemaking, *Ex Parte 332*, 42 Fed.Reg. 39243 (1977).

On these grounds, we can, therefore, uphold the Commission. We do so, albeit, with some reservation. The commitment by Amoskeag was not as cut and dry as either the administrative law judge or the Commission intimates in their cease and desist order.[7] Furthermore, the Commission appears to be using *Ex Parte 332* as a two-edged sword: on the one hand, Amoskeag is held to have violated Commission policy by not seeking prior approval of the new voting trust, as would be required by the regulations proposed in *Ex Parte 332;* on the other hand, Amoskeag is chastened by the Commission for relying on the procedure to avoid possible violations of 49 U.S.C. § 5(5), outlined in *Ex Parte 332*, on the grounds that the regulations are merely *proposed* and not *actual* regulations.

In a decision entered subsequent to the entry of the cease and desist order, the administrative law judge, in a careful opin-

---

7. Our review of the record suggests there was some uncertainty on the part of the Commission as well as Amoskeag as to the precise contours of Amoskeag's commitment. At the June, 1976, hearing, it appeared that, but for the 49 U.S.C. § 5(5) complaint which had been filed against Amoskeag by Maine Central (alleging illegal control), Amoskeag would have been free of the self-imposed interdict. The administrative law judge at one point during the hearing remarked: "You [Amoskeag] had not [*sic*] legal mechanism that I know of that stopped or precluded you from going ahead [and purchasing additional Maine Central stock]." On another occasion, the general counsel of the ICC stated that "if . . . further acquisitions were made, they probably would be no more improper than those already acquired, the validity of which was in issue in the section 5(4) [now section 5(5)] proceeding . . . ." Maine Central's complaint has since been dismissed by the ALJ, who found the allegations of improper control by Amoskeag not to have been substantiated. *Maine Central R.R. Co. v. Amoskeag Co., Frederic C. Dumaine and Dumaines*, ICC Finance Docket No. 27620 (Feb. 17, 1978). An appeal of this decision is pending before the full Commission.

ion, determined that the section 5(5) complaint filed by Maine Central lacked any substantial basis and dismissed it. *Maine Central R.R. Co., Frederic C. Dumaine and Dumaines*, ICC Finance Docket No. 27620 (Feb. 17, 1978). This decision is presently on appeal to the full Commission. We pose the question whether, in light of *Ex Parte 332*, the purchase of additional stock to be placed in a new independent voting trust would be impermissible even were it determined that Amoskeag *had* unlawfully obtained control over Maine Central by virtue of the 34% stock already held. *See* note 3, *supra.*

The proposed regulations, *Ex Parte 332*, outline the steps to be taken in establishing an independent voting trust agreement to assure adequate insulation between the trustee and the beneficial owner. Since the regulations have not as yet been adopted, an interim procedure has been fashioned whereby a party submits its proposal for an unexecuted voting trust and the Commission delivers an informal, nonbinding opinion as to the propriety of the proposed agreement. On January 10, 1978, Amoskeag submitted a petition to the Commission seeking approval of its unexecuted voting trust agreement with The Riggs National Bank of Washington, D. C. Amoskeag proposed to place in this new trust all shares of Maine Central stock it might purchase should the December, 1977, cease and desist order be lifted. On February 22, 1978, the Commission reviewed the proposal and suggested several modifications, noting that the letter in no way acted to lift the cease and desist order.

The posture of the case now before us has changed. The Commission's legitimate concern with requiring a party to adhere to a commitment previously made, in combination with the failure of that party to seek advance approval of a proposed voting trust, has been satisfied. Post-hearing facts have given a new tilt to the situation. The administrative law judge has determined that Amoskeag did not unlawfully obtain control over Maine Central. Amoskeag's petition to the Commission for approval of its proposed voting trust satisfied the requirement of advance notice to the Commission; and the February 22, 1978, letter from the Commission demonstrates Commission awareness of the contemplated purchase.

In light of the Commission's proposed regulations articulated in *Ex Parte 332*, we feel that a remand is appropriate so that the Commission can reconsider Amoskeag's petition to lift the cease and desist order. In so doing, we take this opportunity to outline our understanding of precisely what Amoskeag's original commitment entailed. As we read the record, Amoskeag, prompted by the filing of the section 5(5), 49 U.S.C. § 5(5) complaint by Maine Central, stated that it would refrain from further purchase of Maine Central stock until the Commission had the opportunity to approve a legal method of holding the stock. We do not read the record as suggesting that Amoskeag promised to refrain from further purchase until such time as the Commission approved Amoskeag's plans to effectuate control over Maine Central or until the Commission approved Amoskeag's plans to consolidate the two properties under single management. We have decided that, in the interests of a speedy determination, we shall retain jurisdiction over this matter. We invite the Commission to act expeditiously; we further invite the Commission, if its understanding of the precise nature of Amoskeag's commitment differs from our reading as indicated above, to indicate the grounds for its understanding. Of course, any action taken by the Commission should be based on the current position as presented to the Commission and should not be predicated on any punitive response to perceived transgressions of the past.

■ We find no merit in Amoskeag's suggestion that the Williams Act, 15 U.S.C. § 78n(d), (e), prohibits the Interstate Commerce Commission from regulating proposed corporate takeovers by regulated carriers. *Gilbertville, supra*, 371 U.S. at 125, 83 S.Ct. 217; 49 U.S.C. § 5.

*Remanded for proceedings consistent with this opinion.*