INTERSTATE COMMERCE COMMISSION *v.* UNITED STATES EX REL. LOS ANGELES.

No. 54.  Argued October 28, 29, 1929.—Decided November 25, 1929.

*Mr. Daniel W. Knowlton* for the Interstate Commerce Commission.

54

56

*Messrs. Max Thelen* and *Jess E. Stephens,* with whom *Messrs. Erwin P. Werner,* City Attorney of Los Angeles, *Milton Bryan,* Assistant City Attorney, and *Edwin C. Blanchard* were on the briefs, for the City of Los Angeles.

58

·*Messrs. Frank Karr, A. S. Halsted, C. W. Durbrow, Robert Brennan, and E. W. Camp* filed a brief on behalf of the Southern Pacific Company, Southern Pacific Railroad Company, Los Angeles & Salt Lake Railroad Company, and The Atchison, Topeka & Sante Fe Railway Company, as *amici curiae,* by special leave of Court.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

By petition filed July 12, 1928, respondent sought from the Supreme Court of the District of Columbia a writ of mandamus compelling petitioner, the Interstate Commerce Commission, to consider the evidence introduced in the proceeding before it known as *Los Angeles Passenger Terminal Cases,* 100 I. C. C. 421; 142 I. C. C. 489, for the purpose of determining whether the Commission shall order the Atchison, Topeka & Santa Fe Railway Company, the Southern Pacific Company, and the Los Angeles & Salt Lake Railroad Company to build and use an interstate union passenger station in the City of Los Angeles, California; and after consideration of the evidence, to make such order therein as the facts may require. The Supreme Court of the District dismissed the petition. The Court of Appeals reversed its judgment and remanded the cause for further proceedings. 34 F. (2d) 228. This Court granted a writ of certiorari.

The Railroad Commission of that State had in 1921 (19 Ops., R. R. Com. of Cal., pp. 740, 937) ordered the carriers to file plans, etc., and to acquire sufficient land within what is known as the Plaza area in that city for a union

passenger station and terminal, to submit plans therefor, and, upon their approval by that Commission, to proceed with the construction of the station. The carriers carried these orders by writs of certiorari to the Supreme Court of the State, and that court, in *Atchison, Topeka & Santa Fe R. Co.* v. *Railroad Commission,* 190 Cal. 214, held that by the Transportation Act of 1920 Congress had taken exclusive authority over the matter of a union interstate terminal depot, and the court therefore denied the State Railroad Commission the jurisdiction which it had sought to exercise. The State Railroad Commission petitioned this Court for writs of certiorari and at the same time instituted proceedings before the Interstate Commerce Commission which resulted in the orders above referred to.

This Court granted a writ of certiorari and on April 7, 1924, rendered its decision in *Railroad Commission of California* v. *Southern Pacific Co.,* 264 U. S. 331, wherein, in affirming the judgment of the state court, we held that the relocation of tracks, which was incidental to the proposed union passenger station, required a certificate of approval by the Interstate Commerce Commission under paragraphs 18 to 21 of § 1, Interstate Commerce Act, as amended by § 402, Transportation Act of 1920 (41 Stat. 476, 478,) as a condition precedent to the validity of any action by the carriers or of any order by the State Railroad Commission, and that until the Interstate Commerce Commission had acted under those paragraphs, the carriers could not be required to provide a new union station or to extend their main tracks thereto as ordered by the State Railroad Commission.

Pending the hearing of the causes in 264 U. S. 331, the direct proceeding, referred to above, was instituted before the Interstate Commerce Commission by the City of Los Angeles, asking for an order by the Commission requiring the three railroads to build a new union station at the

Plaza site. With it were consolidated an application by the Southern Pacific Company for authority to abandon certain main line tracks and the operation of passenger and freight train service on Alameda Street, and an application by the Southern Pacific and the Salt Lake for authority to construct new, and to extend existing lines.

The Commission held, 100 I. C. C. 421, that it was without authority to require the construction of the new union station. It said in the report, at page 430:

"We conclude that we are not empowered to require the construction of a union passenger station as sought in No. 14778. To make the record clear, we repeat that no question of discrimination or preference is presented here and that under the issues framed in the complaint in No. 14778 we will give no consideration to matters shown of record for the purpose of determining whether we should issue an order *requiring* the construction and use of a union station by any of the defendants."

The Commission, in order to facilitate dispatch in the disposition of the case, although it held that it had no power to require the building of an interstate commerce passenger station, made hypothetical certificates, which could be summarized as follows:

(1) That the public convenience and necessity require the extensions of lines that may be necessary to reach and serve any union passenger station within the plaza which may be constructed in accordance with a lawful order of the State Commission and that may be necessary to provide for the incidental rearrangement of passenger and freight routes, and that the expense involved will not impair the carriers' ability to perform their duties to the public. (2) That public convenience and necessity permit the abandonment of train service on Alameda Street and such other abandonments of lines as would be necessary in connection with the establishment of any such station, so lawfully ordered by the State Commission.

·The report further found that such joint use of track or other terminal facilities as may be incidental and necessary to the proper operation of any such union station is in the public interest and is practicable, without substantially impairing the owning carriers' ability to handle their own business. As to the application by the Southern Pacific and Salt Lake to extend their lines to permit the joint use of the Southern Pacific's existing station, the Commission's findings were unfavorable and its order denied the application. The Commission's then report was not accompanied by certificates carrying out its findings, and it reserved jurisdiction to alter its findings in the event that the plan of the State Commission, as finally evolved, should be materially different from that ' as here considered to be in the public interest.'

After a further hearing in the direct proceeding instituted by Los Angeles for an order directing the erection of a union station, the prayer of Los Angeles was denied. 142 I. C. C. 489. Thereafter the City filed the petition above referred to, in the Supreme Court of the District of Columbia, for a writ of mandamus. This was in the present proceeding.

Attached to the petition as exhibits were the pertinent parts of the record in the previous cases. There were filed an answer of the Commission, and a demurrer to the answer. The Commission still adhered to its original report. The Supreme Court of the District entered a judgment overruling the demurrer and, the City electing to stand upon the petition, dismissed the petition. On an appeal, the judgment was reversed by the Court of Appeals of the District, which held, in substance, that the Commission was vested with supervisory control over the three carriers and that they were subject to an order requiring the construction of the union station and the necessary connecting tracks prayed for.

The sole question for decision is whether the Interstate Commerce Commission has jurisdiction to order the construction of the union station. This issue arises on provisions of the Interstate Commerce Act, 24 Stat. 379, as amended by the Transportation Act of 1920, 41 Stat. 456, 476–479. These are paragraphs 18 to 22 added to § 1 of the original Act, and paragraphs 3 and 4 of § 3.

These paragraphs and sections of the Transportation Act of 1920 may be shortly stated as follows:

Paragraph 18 forbids the construction of a new line of railroad, or the acquisition or operation of any line of railroad or extension thereof in interstate commerce, unless there shall have been obtained from the Commission a certificate that the present and future convenience and necessity require, or will require, the construction or operation of such additional or extended line of railroad, and forbids any interstate carrier to abandon all or any portion of its line, unless there shall have been obtained from the Interstate Commerce Commission a certificate of public convenience and necessity.

Paragraph 19 requires notice and hearings in any proceeding to secure such certificate.

Section 20 gives the Commission discretionary power to issue such certificates and provides for an injunction at the suit of the United States for any construction, operation or abandonment of such line of railroad or extension thereof without a certificate, and punishes a violation.

Section 21 provides that after a hearing in such proceeding upon complaint, or upon its own initiative without complaint, the Commission may authorize or require by order any carrier by railroad subject to the act to provide itself with safe and adequate facilities for performing as a common carrier its car service, as that term is used in the Act, and to extend its line or lines if the Commission finds that it is reasonably required in the interest of pub-

lic convenience and necessity, and will not impair the ability of the carrier to perform its duty to the public.

. Section 3, embracing paragraphs 3 and 4, provides, in paragraph 3, that carriers shall afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of passengers or property to and from their several lines and those connecting therewith, and forbids discrimination.

Paragraph 4 provides that if the Commission finds that to do so will not substantially impair the ability of a carrier owning and entitled to the enjoyment of terminal facilities to handle its own business, it may require the use of any such terminal facilities of any carrier, including main-line track or tracks for a reasonable distance outside of such terminal, by another carrier or other carriers, on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the Commission may deem just and reasonable for the use so required, as if in condemnation proceedings.

In its final report the Interstate Commerce Commission held that it had no power to require the construction and operation of a union station upon the site specified. The Commission's report was in part as follows:

" Complainants have again raised the question whether we have power to require the defendants to construct and operate a union passenger station upon the site heretofore specified in our findings. Their contention that we have such power was pressed with vigor upon the original submission before us. The complainants point to section 3, paragraphs (3) and (4) of the interstate commerce act as furnishing the necessary statutory authority. As stated in the original report, at page 430, we concluded that we are not empowered to *require* the construction

of a union passenger station as sought in No. 14778, under the issues framed in the complaint therein. . . . In *Alabama & Vicksburg Ry. Co.* v. *Jackson & Eastern Ry. Co.*, 271 U. S. 244, 250, the Supreme Court said:

" ' In matters relating to the construction, equipment, adaptation and use of interstate railroad lines, with the exceptions specifically set forth in paragraph (22), Congress has vested in the Commission the authority to find the facts and thereon to exercise the necessary judgment. The Commission's power under paragraph (3) of Sec. 3 to require the establishment of connections between the main lines of carriers was asserted by it in *Pittsburgh & W. V. R. Co.* v. *Lake Erie, A. & W. R. Co.*, 81 I. C. C. 333, a case decided after the withdrawal by the Jackson & Eastern of its application to the Commission for leave to make the junction at Curran's Crossing, and in *Chamber of Commerce* v. *Wichita Falls, R. & Ft. W. R. Co.*, 109 I. C. C. 81. That its jurisdiction is exclusive was held in *People ex rel. New York C. R. Co.* v. *Public Service Commission*, 233 N. Y. 113, 119-121. Compare *Lake Erie, A. & W. R. Co.* v. *Public Utilities Commission*, 109 Ohio St. 103.' "

The Commission proceeded:

" The distinction between a simple switch connection such as was contemplated by the cases previously referred to, and the elaborate facilities sought to be required by us in the present case, is obvious. Re-examination of the whole subject again leads us to the conclusion that under existing law we are not empowered to require the construction of a union passenger station of the character sought by the complaint. . . .

"All issues of fact having been considered and concluded by our original report and this report on further hearing, nothing remains for us but to deny the application of the city of Los Angeles and the intervener, the

Railroad Commission of the State of California, for a final order herein requiring the construction of a station as found in the public interest. . . ."

In weighing the effect of the Transportation Act, it should be noted that in this important measure affecting associations between interstate carriers of a compulsory character, there is nowhere express authority for the establishment of union passenger stations, compulsory or otherwise. Emphasis is put on physical connection between the tracks of one carrier and others if permitted by the Interstate Commerce Commission and if properly paid for, either by agreement or condemnation, by the carrier enjoying the use of the track of the other companies. But it is limited in extent to connections with the terminals of other companies within a reasonable length. This Court said that the possible peril to interstate commerce in a physical connection between two main tracks " shows that the jurisdiction of the Commission over such connections must be exclusive, if the duty imposed upon it to develop and control an adequate system of interstate rail transportation is to be effectively performed. Moreover, the establishment of junctions between the main lines of independent carriers is commonly connected with the establishment of through routes and the interchange of car services, and is often but a step toward the joint use of tracks." *Alabama & V. R. Co.* v. *Jackson & E. R. Co.*, 271 U. S. 244, 250.

The description in the *Alabama Railway* case, 271 U. S. 244, is that of a physical connection between railroads engaged in interstate commerce, but it contains no suggestion that the junction is to include union passenger stations.

There are cases in the state courts in which by virtue of statutory provision railroads are required expressly to unite in a passenger station, if determined by Commis-

sioners appointed by the Court or by a Railroad Commission. *Mayor and Aldermen of Worcester* v. *Norwich & Worcester R. Co.,* 109 Mass. 103, 113; *Railroad Commission* v. *Alabama Northern R. Co.,* 182 Ala. 357; *Railroad Commission* v. *Alabama Great Southern R. Co.,* 185 Ala. 354, 362; *Missouri, O. & G. R. Co.* v. *State,* 29 Okla. 640; *Chicago, R. I. & P. R. Co.* v. *State,* 90 Okla. 173; *State* v. *St. Louis Southwestern R. Co.* (Tex. Civ. App.), 165 S. W. 491, 199 S. W. 829, 930; but there is no Federal case in which is built up out of such words as those which we find in the Transportation Act of 1920 authority for requiring such a station.

Without more specific and express legislative direction than is found in the Act, we can not reasonably ascribe to Congress a purpose to compel the interstate carriers here to build a union passenger station in a city of the size and extent and the great business requirements of Los Angeles. The Commission was created by Congress. If it was to be clothed with the power to require railroads to abandon their existing stations and terminal tracks in a city and to combine for the purpose of establishing in lieu thereof a new union station, at a new site, that power we should expect to find in congressional legislation. Such authority, if conferred in Los Angeles, would have application to all interstate railroad junctions, including the numerous large cities of the country, with their residential, commercial, shopping, and municipal centers now fixed and established with relation to existing terminals. It would become a statute of the widest effect and would enter into the welfare of every part of the country. Various interests would be vitally affected by the substitution of a union station for the present terminals. A selection of its site from the standpoint of a city might greatly affect property values and likewise local transportation systems. The exercise of such power would compel the

carriers to abandon existing terminals, to acquire new land and rights of way and enter upon new construction, to abandon large tracts and to sell territory of the same extent as no longer necessary for the use of the carriers.

There would have to be tribunals to apportion the expenditures and cost as between the carriers. A proper statute would seem to require detailed directions, and we should expect the intention to be manifested in plain terms and not to have been left to be implied from varied regulatory provisions of uncertain scope. It would be a monumental work and one requiring the most extensive exercise of expert engineering and railroad construction. It would make possible great changes of much importance in the plans of every city and in the rearrangement and mutations of railroad property and public and private business structures everywhere. We find no statutory preparation for the organization of such machinery.

We can not agree with the Court of Appeals of the District in its disposition to view § 3, paragraph 3, as vesting the Interstate Commerce Commission " with almost unlimited power in the matter of establishing terminals and union stations for the proper interchange of traffic between the converging interstate railroad lines." The words " reasonable, proper and equal facilities " are of course comprehensive enough to include not only trackage but terminal facilities described as extending a reasonable distance outside of the terminal, but hardly to give the Commission " unlimited power " in the building of union stations.

To attribute to Congress an intention to authorize the compulsory establishment of union passenger stations the country over, without special mention of them as such, would be most extraordinary. The general ousting from their usual terminal facilities of the great interstate car-

riers would work a change of title and of ownership in property of a kind that would be most disturbing to the business interests of every state in the country.

To recognize what is here sought as within the power of the Commission to order to be done in each of all the great cities throughout the United States, and to sustain it as legal, without provision for effective restraint by the carriers, or other interests, would expose the community to possible abuse, with nothing but self-imposed restraint on bureaucratic extravagance.

When the interest of a great city in its improvements is to be promoted entirely at the expense of railroads that enter it, Congress would be expected to hesitate before it would change discretionary leave for the erection of such stations into positive command. In such a case the expenditure of a large amount of capital will not bring with it corresponding increase in the railroad revenues. If Congress had intended to give an executive tribunal unfettered capacity for requisitioning investment of capital of the carriers and the purchase of large quantities of land and material in an adverse proceeding, we may well be confident that Congress would have made its meaning far clearer and more direct than in the present meager provisions of the Transportation Act. The suggestion of complainants is that out of provisions for local union of main tracks and switching tracks we should use our imaginations and develop them into provisions for giant union passenger stations. It is true that the railway systems may be united through switches and connecting tracks in physical connection, but this has not been held to justify great monumental structures, extended in their complicated machinery and superficial extent and expense. There is a difference of real substance between such connecting tracks and switches and junctions, and a metropolitan union passenger station. The latter calls into being a new

entity naturally requiring new legislative authority. This Court, referring to a kindred matter, said of this case:

" But there is a great difference between such relocation of tracks or local union stations and what is proposed here. The differences are more than that of mere degree; they and their consequences are so marked as to constitute a change in kind." 264 U. S. 331, 346.

But it is said that we have already foreclosed the conclusion in this case by our opinion in 264 U. S. 331. The only issue there presented to this Court, was whether it was necessary to secure from the Interstate Commerce Commission its approval of the construction of a union station and the relocation of the connecting tracks proposed. The point in that case was the necessity for the acquiescence by the Interstate Commerce Commission in respect to a union passenger station. We held such a certificate to be necessary before a union station or connecting lines of interstate carriers could be lawful. That is all we held.

It is quite true that we made references in the opinion to a case foreshadowed in the hypothetical certificates of the Commission in the building of a union station. Such references, had, however, not the slightest significance in respect to who could or should build the station, or whence its cost should be defrayed. It was as far as possible from the purpose of the Court in its opinion to indicate its views of the powers which the Commission could exercise adversely to the carriers in compulsory proceedings. They were not before the Court for adjudication.

In what situations, if any, action of the Interstate Commerce Commission may be controlled or corrected by mandamus need not now be considered, because it is apparent that there is here no meritorious basis for exerting such power, even if found to exist.

The judgment of the Court of Appeals of the District of Columbia is                                        *Reversed.*