619 F.2d 1033
 NORFOLK AND WESTERN RAILWAY COMPANY; Eastern Railroads: The
Baltimore & Ohio Railroad Company, Bessemer & Lake Erie
Railroad Company, Boston & Maine Corporation, The Chesapeake
& Ohio Railroad Company, Delaware & Hudson Railway Company,
Detroit, Toledo & Ironton Railroad Company, Elgin, Joliet &
Eastern Railway Company, Grand Trunk Western Railway System,
Norfolk & Western Railway Company, The Pittsburgh & Lake
Erie Railroad Company, Western Maryland Railway Company;
Southern Railroads: The Alabama Great Southern Railroad
Company, Central of Georgia Railroad Company, the
Cincinnati, New Orleans & Tex. Pac. Ry. Co., Clinchfield
Railroad, Florida East Coast Railway Company, Illinois
Central Gulf Railroad Company, Louisville & Nashville
Railroad Company, Seaboard Coast Line Railroad Company,
Southern Railway Company; Western Railroads: The Atchison,
Topeka & Santa Fe Railway Company, Burlington Northern Inc.,
Chicago & North Western Transportation Company, Chicago,
Milwaukee, St. Paul & Pac. Railroad Company, The Colorado &
Southern Railway Company, The Denver & Rio Grande Western
Railroad Company, Duluth, Missabe & Iron Range Railway
Company, Fort Worth & Denver Railway Company, The Kansas
City Southern Railway Company, Missouri-Kansas-Texas
Railroad Company, Missouri Pacific Railroad Company, St.
Louis-San Francisco Railway, St. Louis Southwestern Railway
Company, Soo Line Railroad Company, Southern Pacific
Transportation Company, Union Pacific Railroad Company,
The Western Pacific Railroad Company, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 No. 79-1220.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 10, 1980.
Decided April 14, 1980.
 
 Michael Boudin, Washington, D. C. (David B. Brown, Washington, D. C., James L. Howe, III, Albert B. Russ, Jr., Richmond, Va., Thormund A. Miller, San Francisco, Cal., Charles C. Rettberg, Jr., Gen. Counsel, Cleveland, Ohio, on brief), for petitioners.
 John J. McCarthy, Jr., I.C.C., Washington, D. C. (John H. Shenefield, Asst. Atty. Gen., John J. Powers, III, Asst. Chief, Appellate Section, Antitrust Division, Robert Lewis Thompson, Antitrust Division, Dept. of Justice, Mark L. Evans, Gen. Counsel, I.C.C., Frederick W. Read, III, Associate Gen. Counsel, I.C.C., Washington, D. C., on brief), for respondents.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and MacKENZIE,* Chief District Judge.
 MURNAGHAN, Circuit Judge:
 
 
 1
 At issue is the validity of an order by the Interstate Commerce Commission.
 
 I.
 The 1974-1975 Temporary Tariff
 
 2
 On May 6, 1974, in Ex Parte No. 305, almost all of the nation's railroads filed a tariff (hereinafter "305") with the ICC to increase rail rates nationwide by ten percent effective June 5, 1974. In an accompanying petition, the railroads represented to the Commission "that billions of dollars are needed immediately and in the coming decade for maintenance and improvement of the Nation's rail transportation plant." Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974, quoted in United States v. Chesapeake & Ohio Railway (Chessie ), 426 U.S. 500, 503, 96 S.Ct. 2318, 2320, 49 L.Ed.2d 14 (1976). Under the Interstate Commerce Act, prior ICC approval was not required for the new rates to go into effect, but the Commission had the power to suspend the effectiveness of the new tariff for up to seven months beyond its original effective date. Cf. 49 U.S.C.A. § 10707 (West Supp.1979) (current version allowing suspensions up to ten months in some cases). In certain circumstances, so long as it acts within that time period, the Commission may set aside a suspended rate or even a rate which has already become effective if it decides that the rate is unlawful.
 
 
 3
 On June 4, 1974, the day before the new rates were to go into effect, the Commission served an order in which it suspended the effective date of the new rates through January 4, 1975. The Commission acknowledged the railroads' need for revenues to effect improvements in their physical plant and equipment, but it was concerned about the possibility that the railroads would not in fact use the additional revenues for the purposes with which they had justified the rate increase:
 
 
 4
 (T)he service provided by the nation's railroads is less than adequate and is in danger of further deterioration detrimental to the public interest . . . (;) in order to improve service the railroads must generate additional revenues(;) and . . . the increases proposed would, if permitted to become effective, generate additional revenues sufficient to enable the carriers to prevent further deterioration and improve service. However, if the schedules were permitted to become effective as filed and without conditions designed to promote service improvements, the increases proposed would be unjust and unreasonable and contrary to the dictates of the national transportation policy . . . .
 
 
 5
 Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974, at 1-2, reprinted in 39 Fed.Reg. 20,256, 20,256 (1974).
 
 
 6
 Accordingly, the Commission provided in its order that, if the railroads chose to cancel the suspended tariff, they would be authorized to establish a new tariff with less than the usual period of notice to the Commission, so long as the increases in rates in the new tariff did not exceed those in the canceled tariff and so long as the new tariff was subject to certain conditions which the Commission believed would insure that the resulting additional revenues would in fact be used to improve railroad service. The central condition was:
 
 
 7
 (T)he Commission intends that revenues generated by increases authorized herein, over and above the amount needed for increased material and supply costs, other than fuel, will be used by the respondents exclusively for reducing deferred maintenance of plant and equipment and delayed capital improvements in order that rail service to the shippers will be improved. The Commission expects that the authorized increases will enable the respondents ( ) to expend substantially more for maintenance and capital improvements than in recent years and will evaluate respondents' compliance with this directive.
 
 
 8
 Id. at 4, 39 Fed.Reg. at 20,257 (emphasis in original). A further condition on the new tariffs was that the railroads provide the Commission with certain information to allow the Commission to evaluate whether the new revenues were in fact being used for the specified purposes.
 
 
 9
 The next day, the railroads accepted the Commission's offer. They canceled the previous tariff and filed a new one which was to be subject to the conditions spelled out in the Commission's order of the previous day.
 
 
 10
 Despite the conceptual simplicity of a requirement that, in order to improve rail service, the railroads had to use the new revenues exclusively for reducing backlogs of delayed capital improvements and deferred maintenance of plant and equipment, significant practical problems confronted the Commission in policing the railroads' compliance. Even before June 1974, the railroads' combined rate of expenditure for maintenance and capital improvements exceeded the additional funds to be generated by the new tariff. It would have been meaningless, therefore, for the Commission merely to require that the railroads spend on deferred maintenance and delayed capital improvements an amount no less than the new funds to be generated. Such a requirement would have enabled the railroads to reduce their other expenditures for deferred maintenance and delayed capital improvements and thus to continue a level of service which the Commission had found less than adequate. Nor would it have been any more meaningful to have required that the 305 revenues be spent solely on a specific list of backlogged projects, since the railroads would have been free to reduce their level of current maintenance and capital improvements, with the result that new deferrals might have been added to the backlog as fast as old ones were removed. The Commission had found that absence of protection against such a compensating reduction would render the new tariff unreasonable. Thus, because the essence of the condition accepted by the railroads was that the 305 funds would be used exclusively to effect a reduction in deferrals and an improvement in service, compliance involved not only spending the 305 revenues satisfactorily but also sustaining out of other funds at least that level of maintenance and capital improvement which would have been sustained if the 305 increase had not been granted.[1]
 
 
 11
 By an order dated July 18, 1974, and served July 22, 1974,[2] and modified with service August 12, 1974,[3] the Commission set out the standard according to which it would judge compliance by the railroads with the spending condition that they had accepted. In sum, the Commission did two things. First, it defined acceptable projects for 305 revenues as being particular items of maintenance or capital improvement which were neither budgeted nor estimated by the railroads prior to the contemplated availability of the 305 increase. Second, it created an irrebuttable presumption in favor of the railroads that any expenditure for deferred maintenance or delayed capital improvements would satisfy the definition so long as a railroad's maintenance and capital expenditures from non-305 funds equaled or exceeded its comparable expenditures during a baseline period.
 
 
 12
 More specifically, the actions taken included the following:
 
 
 13
 1. The Commission defined "deferred maintenance" and "delayed capital improvements."
 
 2. It provided that:
 
 14
 For purposes of this order, expenditures for deferred maintenance and delayed capital improvements will be deemed to be expenditures in excess of the maintenance and capital expenditures which have been budgeted for the 3rd and 4th calendar quarters of 1974 and estimated expenditures which would normally be budgeted for the 1st and 2nd calendar quarter(s) of 1975 providing the estimates for these two calendar quarters equal or exceed the average level of maintenance and capital expenditure for the first six months of the years 1971-1974, inclusive on a current dollar basis.
 
 
 15
 Order of July 22, 1974, at 1-2, 39 Fed.Reg. at 27,194.
 
 
 16
 3. It allowed up to thirty percent of the new funds to be applied to increased material and supply costs, excluding fuel, provided such costs were actually incurred. That is, it found that thirty percent of the 305 increase was justified on the basis of increased costs, while the remaining seventy percent was justified by the need for increased attention to deferred maintenance and delayed capital improvements.
 
 
 17
 4. It excluded from the spending condition that portion of the remaining seventy percent of the increase which represented increased income taxes.
 
 
 18
 5. It imposed certain accounting and reporting requirements on the railroads so that the Commission could monitor their compliance.
 
 
 19
 6. It required all costs to be estimated on the basis of prices as of June 30, 1974.
 
 
 20
 By an order voted October 3, 1974, the Commission established procedures and standards for granting relief from the spending conditions to financially troubled railroads. See Ex parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974, reprinted in 39 Fed.Reg. 36,545 (1974) (corrected version reprinted in 39 Fed.Reg. 37,022 (1974)).
 
 
 21
 The validity of the spending condition was challenged in the courts on the grounds that the ICC under applicable statutes does not have power conferred on it to make managerial decisions, specifically decisions as to when to make improvements and how much to budget for improvements. A three-judge district court, speaking through Judge Butzner, agreed with the railroads and voided the condition. Chesapeake & Ohio Railway v. United States, 392 F.Supp. 358 (E.D.Va.1975) (three-judge court). However, the Supreme Court, in United States v. Chesapeake & Ohio Railway (Chessie), 426 U.S. 500, 510, 96 S.Ct. 2318, 2323, 49 L.Ed.2d 14 (1976), reversed. The Supreme Court acknowledged the general absence of authority in the ICC to make managerial decisions, but, nevertheless, held that the Commission may, "as a condition for not suspending and subsequently investigating the lawfulness of a proposed tariff, require the railroads to devote the additional revenues to a need which, they allege, justifies the increase." The Court noted that, by imposing the spending condition, the Commission had merely held the railroads to their own representation that the increase was justified by needs in the areas of delayed capital improvements and deferred maintenance. It further noted that the railroads had not been required to submit the tariff subject to the condition. They had had the option to have insisted on the unconditional increase for which they initially filed, to have submitted proof of its reasonableness to the Commission, and (if successful) to have collected rates based on the new tariffs. The Commission's action in suspending the rates meant, however, that the railroads would have collected none of the increase during a period of up to seven months. In essence, the Supreme Court held that, by contract, the ICC could grant to the railroads benefits which it could otherwise have denied in return for a ceding by the railroads of some of their retained prerogatives to make management decisions.
 
 
 22
 The present case, therefore, is one in which we must measure action subsequently taken by the ICC to require increased levels of expenditure for deferred maintenance and delayed capital improvements against the scope of the regulatory authority ceded by the railroads when, in 1974, they accepted the offer of the ICC and agreed to be bound by the conditions which the ICC proposed. While the source of the Commission's authority is contractual rather than statutory, the contract could only be entered because of certain statutory grants of authority to the ICC, and the approach is not markedly different from the one which would be taken if the ICC's authority derived directly from a statute which contained the same terms as the agreement before us.
 
 The 1975-1977 Temporary Tariffs
 
 23
 A. In the spring of 1975, the railroads petitioned to have the increased rates made permanent and to have the spending conditions removed. By an order served June 12, 1975, the Commission refused to make the increases permanent, but it noted:
 
 
 24
 (T)he railroads have shown a need for continuation of the . . . increase, but have not shown sufficient cause for elimination of the conditions imposed in regard to the use of funds (over the amount specified for increased material and supply cost and increased income taxes) for deferred maintenance and delayed capital improvements, the purposes for which the increases were granted on the basis of the carriers' representations.
 
 
 25
 Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974, at 2. Accordingly, it extended the expiration date from June 30, 1975, to April 30, 1976, and refused to end the spending condition.
 
 
 26
 Vice-Chairman O'Neal dissented in part from the order extending the expiration date because he believed that the railroads had succeeded in subverting the condition. He observed:
 
 
 27
 New deferrals (of maintenance and capital investment) are increasing faster than old deferrals are overcome. The carriers appear to be reducing their customary level of expenditures for maintenance and capital investment to offset the Ex Parte No. 305 revenues . . . . The net result is that the conditions which the Commission imposed in this proceeding are without effect. The purpose of the Commission's action in granting the (portion) of the sought increase . . . which was not cost justified has been frustrated.
 
 
 28
 Id. at 3.
 
 
 29
 B. On March 15, 1976, the railroads again petitioned the Commission to make permanent the 305 increase and to eliminate the spending conditions. The Commission refused to make the increase permanent, but it allowed the railroads to extend the expiration date of the increase until January 1, 1977, subject to the continuation of the spending condition. Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974 (order served April 29, 1976).
 
 
 30
 Commissioner Gresham dissented in part. Referring to the Commission's relaxation of the conditions in practice and its exemption of some railroads from compliance, he stated that the increase would be justified only if the "more stringent conditions set forth in our orders of June 3, 1974, and July 18, 1974," were imposed by the Commission and complied with by all railroads. Id. at 3.
 
 
 31
 Commissioner O'Neal and Vice-Chairman Clapp also dissented. Although they noted that "(t)he carriers have never submitted the information required in the Commission's orders," they believed, as a result of data from other sources, that the carriers had failed to maintain "the minimum normal level of maintenance required" by the initial order and subsequently implemented by the presumption employing the July 1971 to June 1974 current-dollar baseline. Because the data through September 1975 made it appear "that new maintenance and capital investment (was) being deferred as fast as the deferred maintenance and capital improvement (was) eliminated," there had developed "a situation where the carriers ignore conditions imposed by an agency of the Federal Government and that agency overlooks it." Id. at 5-6, 8. Accordingly, Commissioner O'Neal and Vice-Chairman Clapp believed that further extension of the rate increase should have been premised upon compliance with the spending condition.
 
 
 32
 C. The following November, the railroads petitioned yet again to make the increase a permanent one and to eliminate the spending and reporting conditions. By an order served December 28, 1976, the Commission again refused to make the increase permanent but allowed the expiration date to be extended to January 1, 1978. It slightly modified the definition of "delayed capital improvements" but retained the presumption that:
 
 
 33
 (E)xpenditures for deferred maintenance and delayed capital improvements will be deemed to be expenditures in excess of the maintenance and capital expenditures which would normally be budgeted for the 3rd and 4th calendar quarters of 1976 and the 1st and 2nd quarters of 1977, providing the estimates for those calendar quarters equal or exceed the average level of maintenance and capital expenditures for the period of July 1, 1971 through June 30, 1974 inclusive, on a current-dollar basis.
 
 
 34
 Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974, at 2. Thus modified, the spending condition was continued.
 
 
 35
 Commissioner Gresham dissented in part because he believed that no railroads who participated in the increase should have been excepted from the spending conditions originally adopted. Commissioner O'Neal and Vice-Chairman Clapp dissented in part because, although most railroads now appeared to be in compliance with the conditions, two major ones were not. They urged that the noncomplying carriers be given only a six-month rather than a twelve-month extension of the increase, and they also noted that, if the baseline were to remain a valid representation of "normal levels of annual maintenance and capital improvements," some adjustment for inflation might soon be required. Id. at 7.
 
 
 36
 The Permanent Tariff and the Inflation Index
 
 
 37
 On November 21, 1977, the railroads for a fourth time petitioned that the increase be made permanent and that the conditions imposed be removed. By an order served on December 29, 1977, the Commission agreed to make the increase permanent but refused to remove the spending condition. It did, however, change the category "delayed capital improvements" to "capital improvements" with a corresponding alteration in the definition. The Commission also expressed concern that inflation had impaired the accuracy of the current-dollar baseline "as a meaningful representation of normal levels of expenditures for maintenance and capital improvement." Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1977, Petition for Relief, at 2.
 
 
 38
 Under the rationale of Chessie, the Commission clearly had the authority at that point to state that it would suspend and investigate the new tariff, and refuse to make it permanent, unless the railroads agreed, as a quid pro quo for the Commission's not doing that, to accept Commission action indexing the deferred maintenance and capital improvements requirement for inflation. Instead of following that course, however, the ICC, purporting to act under the powers over railroad expenditures obtained in its 1974 deal with the railroads, put forth a proposed indexing scheme to which it invited comments by all interested parties. The proposed indexing scheme, which was scheduled to begin as of July 1, 1978, would have reduced to baseline-period dollars both the net yield from the Ex Parte 305 revenues and the railroads' actual expenditures for maintenance and capital improvements. Once reduced, the figures were to be compared to the baseline-period expenditures to ascertain whether or not a railroad was complying with the spending condition.
 
 
 39
 In the railroads' response to the proposal, they opposed the continuation of the condition in principle, they opposed any inflation adjustment in principle, and they made certain technical objections to the particular indexing method which had been suggested.
 
 
 40
 By an order served February 8, 1979, the Commission adopted an inflation index which purportedly would measure whether the Ex Parte No. 305 revenues were being used for increased maintenance and improvements, as promised, or whether the rationale for those revenues was being subverted by compensating reductions in normal levels of maintenance and capital expenditure. In response to the railroads' technical objections, the indexing formula as adopted was altered from that originally proposed. In the formula's final form, instead of deflating the 305 revenues and the current expenditures using a general-purpose index, the Commission sought to inflate the baseline-period expenditures, using a particularized index for each type of expenditure. Also, the reporting requirements needed to measure compliance were incorporated into the railroads' annual reporting requirements so that separate reports would no longer be necessary. Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates and Charges, 1974, 359 I.C.C. 377 (1979).
 
 
 41
 Three ICC members dissented, at least in part. Commissioner Stafford believed that the transition from the unindexed to the indexed baseline was too abrupt to be prudent. Commissioner Gresham dissented only insofar as the Commission continued to allow exemptions from the spending conditions. Commissioner Christian believed that all the conditions should be removed.Interim General Rate Increases
 
 
 42
 Between the imposition of the spending condition in the summer of 1974 and the implementation of the indexed baseline in the winter of 1978-1979, the Commission had allowed eight general rate increases, Ex Parte Nos. 310, 313, 318, 330, 336, 343, 349, and 357. Presumably the increases were granted to the railroads because of the inflation that they were experiencing in their costs. The record does not reveal, however, whether the Commission intended that they cover only increases in operating costs or whether it considered them adequate also to cover increases in the costs of maintenance and capital improvements. Counsel for the railroads has represented to us, without contradiction from counsel for the ICC, that the eight increases were inadequate even to cover increases in operating costs alone.
 
 II.
 
 43
 The railroads have petitioned this Court to enjoin continuation of the spending condition and, failing that, to enjoin implementation of the Commission's formula to compensate for inflation. Since the Commission has claimed no authority for the inflation index other than that flowing from the commitments undertaken by the railroads in order to receive the 305 revenues, we need consider only the terms of that undertaking. Thus, there is no authority for the inflation formula, because the agreement expresses the baseline level of spending in current dollars.
 
 
 44
 At no subsequent time did the railroads agree to the imposition of the inflation index. When the Commission proposed the index in 1977, it followed a procedure quite different from that which had accompanied the initial imposition of the spending condition in 1974. In 1974 the railroads could have indicated nonacceptance of the spending condition merely by refusing to withdraw their original request for an unconditioned rate increase. In 1977, on the other hand, the only way for them to indicate nonacceptance would have been to have refused to accept revenues which the ICC had just approved as reasonable, without any contractual concessions by the railroads in the way of accepting conditions proposed by the ICC. Accordingly, we believe that the railroads' receipt of the 305 funds after January 1, 1978, did not constitute acceptance either of the Commission's first proposed inflation-indexed formula or of the inflation-indexed formula it finally adopted.
 
 
 45
 If the inflation-indexed formula were to be enforced, the sources of funds for the conditioned expenditures would be as follows: expenditures for the current-dollar baseline from pre-305 revenues;[4] 70% of 305 net receipts from 305 funds; increase in baseline expenditures required by the inflation index from the eight post-305 general rate increases. But, so far as the record reveals, when the ICC granted each of the post-305 increases, it did not attempt to condition grant of the increases on application of the resulting revenues or any portions of them to a specified type or specified types of expenditures. The railroads were, therefore, not bound contractually to earmark any of the revenues attributable to post-305 increases.[5]
 
 
 46
 Having failed to subject the 305 revenues to the inflation index when it had the opportunity to do so in 1977 and having failed to condition the expenditure of the revenues out of which the inflated costs of providing the baseline level of service would have to come, the Commission may not now rewrite its 1974 agreement with the carriers. Implementation of the inflation index will, therefore, be enjoined.[6]
 
 III.
 
 47
 There is no merit to the railroads' challenge to the reasonableness of that part of the Commission's order which continued the spending condition.
 
 
 48
 GRANTED IN PART; DENIED IN PART.
 
 
 
 *
 The Honorable John A. MacKenzie, Chief Judge, United States District Court for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The language of the June 4, 1974, condition is, nevertheless, inexact enough to be capable of supporting a limited construction that only the dedication of 305 revenues to the enumerated purposes was required. However, the inherent ambiguity was such that the condition's language was susceptible of a more meaningful construction requiring both expenditure of the 305 funds and dedication from other sources of funds equal to the baseline level of expenditure attained before the 305 rate increase had been granted. By their subsequent conduct, the parties have shown that they intended the latter construction, and, although the railroads in this case attack continuation of any spending condition, they do not contend that, if the condition is to be continued, there is any impropriety in the requirement that the baseline level of spending, as originally determined in 1974, be maintained. The question before us, therefore, is not whether the June 4, 1974, agreement contained a baseline commitment at all but whether the ICC's attempted revision of the manner of computing the baseline was within the authority ceded by the railroads in consideration for the Commission's non-suspension of rate 305
 
 
 [2]
 Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates & Charges, 1974 (Reporting Requirements), reprinted in 39 Fed.Reg. 27,194 (1974)
 
 
 [3]
 Ex Parte No. 305, Nationwide Increase of Ten Percent in Freight Rates & Charges, 1974 (Reporting Requirements), reprinted in 39 Fed.Reg. 30,981 (1974)
 
 
 [4]
 Since those revenues derive from ICC approved rates, expressed solely in dollars, without any adjustment for fluctuation in currency value or purchasing power, inflation would lead to no increase in such revenues. Increases for other reasons, such as expanded volume of rail traffic, are not shown from the record to have occurred
 
 
 [5]
 Even assuming that the railroads' petitions for the rate increases represented that the increases were necessitated by inflation in the costs of maintenance and capital improvements and even assuming that the increases were granted by the ICC on those grounds, an enforceable condition was not created merely by acceptance of the funds. Chessie provided the Commission with a procedure by which it could assure that revenues would be spent in a certain fashion if absence of such assurances would make unreasonable the tariffs producing those funds. If the Commission chooses not to use the Chessie procedure, it thereby chooses to rely on the good faith and integrity of the carriers, and it may not unilaterally rewrite its agreements if it later regrets those choices. The rule is well established that, absent a contractual ceding by the railroads to the Commission of authority over managerial decisions, such as which applications to make of revenues, the authority rests exclusively with the railroads and not at all with the ICC
 In upholding what we find to be a legitimate, reasonable, and direct adjunct to the Commission's explicit statutory power to suspend rates pending investigation, we do not imply that the Commission may involve itself in the financial management of the carriers. See ICC v. United States ex rel. Los Angeles, 280 U.S. 52 (, 50 S.Ct. 53, 74 L.Ed. 163) (1929).
 Chessie, 426 U.S. at 514, 96 S.Ct. at 2325.
 
 
 [6]
 It should be noted that:
 A. Our decision does not totally freeze application of the 305 revenues in accordance with the 1974 actions of the ICC. The condition contractually accepted by the railroads calls for application of all 305 revenues not needed to meet increased material and supply costs, other than fuel, to reduce backlogs of deferred maintenance and delayed capital improvements. The 30%-70% allocation between the two categories of expenditures was then the ICC's best estimate. If an investigation were to determine that the split was no longer appropriate, the ICC, acting within the power conferred by its agreement with the railroads, could adjust it.
 B. We do not imply that any condition imposed by the ICC in return for its approval or nonsuspension of proposed rates will automatically be deemed valid and enforceable. We deal here only with one judicially ascertained to be so. Circumstances can be imagined in which carriers desperate for rate increases might seek to sell their birthrights for messes of pottage. The public interest might manifestly be disserved in such a situation, and the courts, in that case, might well invalidate the condition as abusive and unwarranted.