CONSOLIDATED RAIL CORPORATION, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

The City of New York and the Metropolitan Transportation Authority of the State of New York, Chelsea Property Owners, New York Convention Center Development Corporation, Intervenors.

CITY OF NEW YORK and the Metropolitan Transportation Authority of the State of New York, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Chelsea Property Owners, Consolidated Rail Corporation, Intervenors.

CHELSEA PROPERTY OWNERS, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Consolidated Rail Corporation, City of New York and the Metropolitan Transportation Authority of the State of New York, Intervenors.

Nos. 92–1473, 92–1528 and 92–1548.

United States Court of Appeals, District of Columbia Circuit.

Argued March 1, 1994.

Decided July 22, 1994.

Paul Cunningham, Washington, DC, argued the cause for Consolidated Rail Corporation, petitioner in No. 92–1473 and intervenor in Nos. 92–1528 and 92–1548. On briefs were Robert M. Jenkins, III, Joel A. Rabinovitz, Washington, DC, Constance L. Abrams and Jonathan M. Broder, Philadelphia, PA.

Peter A. Greene, New York City, argued the cause for the City of New York, et al., petitioners in No. 92–1528 and intervenors in Nos. 92–1473 and 92–1548. On briefs was Gail Rubin, Asst. Corp. Counsel, City of New York. Fabian G. Palomino, New York City, entered an appearance.

Scott N. Stone, Washington, DC, argued the cause for Chelsea Property Owners, petitioner in No. 92–1548 and intervenor in Nos. 92–1473 and 92–1528. On briefs was John L. Oberdorfer, Washington, DC.

Evelyn G. Kitay, I.C.C., Washington, DC, argued the cause for the respondents. On brief were Henri F. Rush, Acting Gen. Counsel, I.C.C., Ellen D. Hanson, Associate Gen. Counsel, I.C.C., Anne K. Bingaman, Asst. Atty. Gen., Dept. of Justice, and Catherine G. O'Sullivan and Andrea Limmer, Dept. of Justice, Washington, DC. Robert S. Burk, I.C.C., Washington, DC, entered an appearance.

Before: WALD, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Petitioner Consolidated Rail Corporation (Conrail) seeks reversal of the issuance by the Interstate Commerce Commission (ICC or Commission) of a certificate of abandonment for a one and one-half mile section of elevated railroad track in New York City owned by Conrail and known as the Highline. Intervenors Chelsea Property Owners (CPO), who own property adjacent to the elevated track, and the City of New York, the Metropolitan Transit Authority of New York, the New York Convention Center Development Corporation and the New York State Department of Transportation (New York parties) ask that the issuance of the certificate be affirmed. As cross-petitioners, the New York parties ask that the ICC's decision to condition the abandonment on the posting of a surety bond by CPO be reversed. CPO supports the New York parties on the surety bond issue and Conrail supports the ICC.

■■■ This case involves an unusual practice known as adverse abandonment. In a typical abandonment case a railroad requests the ICC to allow it to discontinue service over a particular line. If the ICC finds that the public convenience and necessity require or permit abandonment, it issues an abandonment certificate. *See* 49 U.S.C. § 10903(a). In an adverse abandonment, the carrier wants to continue service; it is a third party who seeks the issuance of an abandonment certificate. Generally, a third

party seeks abandonment because it wants the rail line condemned; an abandonment certificate can be used in state court to establish that the line is not required for rail service in interstate commerce and therefore is not exempt from local or state condemnation. *See Kansas City Pub. Serv. Freight,* 7 I.C.C.2d 216, 225 (1990) (quoting *Modern Handcraft, Inc.,* 363 I.C.C. 969, 972 (1981)). Once an abandonment certificate issues, property owners with reversionary rights in the rail line may be able to have the line condemned and their property restored.

This case follows the typical pattern: CPO seeks the abandonment certificate so that the Highline can be condemned and its members can assert their reversionary rights in the property. Conrail opposes abandonment ostensibly because it hopes to provide service over the line. Nevertheless, it appears that Conrail opposes abandonment at least in part because of its potential liability for demolition costs if the Highline is condemned. If Conrail could prevent the issuance of an abandonment certificate by opposing it, it would increase its leverage in negotiating with CPO and the New York Parties on the payment of demolition costs. For the reasons set forth below, the petitions for review are denied and the ICC's decision affirmed.

I.

The Highline is a 1.45 mile elevated rail line in Manhattan running along a viaduct from 34th Street at the north end to Gansevoort Street at the south end. Built in the 1930s, the Highline initially carried heavy traffic but it declined during subsequent decades and the line fell into disuse during the 1970s. Conrail ceased operations over the Highline in the mid–1970s. Over time, Conrail sold off portions of the land on which the Highline runs but maintained easements for freight service. By 1982 Conrail eliminated from the line all stations and team tracks (facilities at which freight is loaded and unloaded). *Chelsea Property Owners,* 8 I.C.C.2d 773, 775 (1992) (hereinafter *Order*).

In the early 1980s, the New York State Department of Transportation (NYSDOT) attempted to purchase the Highline to make way for a proposed highway project. Conrail asked the ICC for permission to abandon the line but a third party made an offer of financial assistance to keep the line operational. Joint Appendix (JA) at 44–45. If a financially responsible third party agrees to purchase a line or subsidize traffic over it, the ICC does not issue an abandonment certificate. *See* 49 U.S.C. § 10905. By the time the ICC determined that the third party was not financially responsible, NYSDOT had abandoned the highway project and no longer wanted to purchase the Highline. In 1988, therefore, Conrail asked to withdraw its abandonment application. The ICC agreed to the withdrawal but nonetheless observed that "opponents are free to file their own application ... to abandon this line." Docket No. AB–167 (Sub–No. 493N), decision dated January 29, 1988 (served February 11, 1988) at 6.

Shortly thereafter, Conrail and CPO began negotiations for voluntary removal of the line; the negotiations failed, however. As a result, CPO filed an adverse abandonment application which was assigned to an administrative law judge (ALJ). Before the ALJ, CPO presented evidence that the Highline was deteriorating, dangerous and an eyesore. It offered to show that no demand for service on the line existed, that freight could not be loaded on the elevated line and that rehabilitation of the line was economically infeasible. Additionally, CPO claimed that Conrail had no intention of operating the line but instead opposed the abandonment in order to avoid potential demolition costs. The New York parties supported CPO's position. Conrail countered that the line could be rehabilitated at a relatively minimal cost, that demolition of the Highline would cost $34 million and that it had a prospective customer for the line's services in Browning Ferris Industries (BFI), a solid waste disposal company. Conrail proposed trucking raw waste to a site next to the Highline—to be acquired and equipped by Conrail—at which the waste would be containerized and loaded onto freight cars. The ALJ issued an initial decision denying the abandonment application. JA at 41–65. He found that Conrail had submitted credible evidence of potential traffic on the Highline and therefore the public

convenience and necessity did not require or permit abandonment.   JA at 65.

On appeal to the ICC, CPO produced evidence that BFI had allowed its letter of intent with Conrail to lapse;  Conrail countered with a one-sentence letter from BFI stating that BFI continued to work with Conrail on the proposed project.  CPO also offered evidence that BFI refused to become involved in the abandonment proceedings, would not fund the study of proposed waste-loading sites and had a corporate policy prohibiting it from developing projects that face serious community opposition, as the Highline apparently did.  CPO also introduced into the record a demolition contractor's bid to remove the Highline for $6,728,000 and informed the ICC that it had offered to indemnify Conrail for any demolition expenses in excess of seven million dollars. CPO argued that "[t]his should effectively put to rest Conrail's claim that granting CPO's abandonment application would force Conrail to incur demolition costs in any amount over $7 million."  JA at 596.  The New York parties argued that the Highline was a safety hazard, there was no real demand for rail service over the line and the Highline impeded revitalization projects in the area.

In September 1992, the ICC issued its decision permitting abandonment of the Highline.  It concluded that Conrail's proposed use of the Highline for waste haulage was neither practicable nor economically feasible.  *Order*, 8 I.C.C.2d at 73–83.  In evaluating economic feasibility, the ICC considered, among other things, land acquisition costs, payback periods for the land of five and ten years and demolition costs.  Three estimates of demolition cost were considered: CPO's offer to indemnify for costs above $7 million, CPO's initial estimate of $11 million and Conrail's estimate of $34 million.  The ICC found that the proposed waste haulage plan was economically infeasible at all payback levels except those based on the $34 million demolition cost.  But, given CPO's willingness to put to rest the demolition cost question by offering to indemnify CPO for costs in excess of $7 million, the ICC decided to permit abandonment conditioned on CPO's

posting a surety bond to indemnify Conrail for costs above $7 million.  *Id.* at 78–83.

On petition, Conrail argues that preserving the Highline would serve the public convenience and necessity.  It also maintains that there is a statutory presumption in favor of preserving rail lines whenever such preservation would not deleteriously affect the financial interests of the railroad.  Finally, it claims that Commission precedent prohibits the issuance of an abandonment certificate in this case.

## II.

### A.  Public Convenience and Necessity

[3]  We accord the ICC's abandonment decision considerable deference.  *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 319, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981).  Indeed, so long as the ICC engaged in reasoned decisionmaking, and the decision is adequately explained and supported by the record, we will sustain the decision.  *See CMC Real Estate Corp. v. ICC*, 807 F.2d 1025, 1030 (D.C.Cir.1986);  *see also Universal Cameral Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

[4, 5]  The Interstate Commerce Act (Act) authorizes the ICC to permit the abandonment of a railroad line "only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance."  49 U.S.C. § 10903.  "There is no requirement ... that the application [for abandonment] be made by the carrier whose operations are sought to be abandoned," *Thompson v. Texas Mexican Ry.*, 328 U.S. 134, 145, 66 S.Ct. 937, 944, 90 L.Ed. 1132 (1946), and, in fact, the ICC may grant an application even when the carrier objects.  *Modern Handcraft, Inc.*, 363 I.C.C. 969, 972 (1981).  The party seeking abandonment bears the burden of proving that abandonment would serve the public convenience and necessity.  49 U.S.C. § 10904(d)(1).

[6, 7]  In assessing whether the public convenience and necessity permit abandonment, the ICC focuses on transportation-

related factors. *Order*, 8 I.C.C.2d at 783. Generally, the Commission denies an adverse abandonment application if there is potential for future operation on the line and the carrier has taken reasonable steps to attract traffic. *Id.* at 778. Here, the ICC concluded that there was essentially no possibility of future traffic on the Highline despite Conrail's efforts to attract traffic. Thus, it concluded that the public convenience and necessity permitted abandonment. The ICC engaged in a two-part analysis of the only project Conrail ever proposed, the waste hauling project. First, it asked whether Conrail's proposed waste hauling project was practicable: could waste be loaded on and transported over the Highline? *Id.* at 779. Second, the ICC asked whether the plan was economically feasible. *Id.* The Commission found that the plan was neither practicable nor economically feasible. Because the ICC acted reasonably in reaching its conclusion and because the conclusion is supported by the record, we sustain the ICC's decision.

CPO demonstrated, and Conrail does not seriously contest, that Conrail would need to acquire land in order to carry out the waste hauling project: Conrail proposed containerizing and loading raw waste from a site adjacent to the Highline, a proposal apparently requiring at least three acres of land. *See* JA at 576. But the land it needs is either unavailable or unsuitable. Further, CPO established that BFI—the potential customer for the waste-hauling services—was no longer interested in the plan. BFI allowed its letter of intent to expire, it declined to participate in the abandonment proceedings, it would not fund the study of two proposed loading sites and its corporate policy suggested that it would not become involved in a project to which the community objected. The only fact in Conrail's favor is that BFI submitted a one-sentence letter stating that it continued to be interested in the project. But the Commission found, in light of BFI's reticence about the project, that the letter merely expressed BFI's desire to keep options open. Additionally, the Commission concluded that the position of the New York parties in favor of abandonment "constitute[d] strong evidence that the demolition of the viaduct would further the public interest

in New York City." *Order*, 8 I.C.C.2d at 783. Given these facts and in light of the fact that the Highline has not been used in more than ten years, the ICC's conclusion that the waste hauling project was not practicable was adequately explained and supported by the record.

The ICC next considered the economic feasibility of the waste-hauling project. It concluded, based on the only evidence in the record, that acquisition of the land necessary for the project (if it could be acquired) would cost $13.24 million. *Id.* at 784. It also took into account three alternative cost figures to demolish the Highline: $7 million based on CPO's indemnity offer, $11 million based on CPO's initial cost analysis and $34 million based on Conrail's analysis. Finally, the ICC projected three potential traffic volume levels, 700, 1500 and 3000 tons of waste per day. *Id.* at 786–88.

Based on these figures, but not including the saved demolition costs, the ICC concluded that the project would be economically infeasible at any tonnage level if the land had to be paid for in either five or ten years. *Id.* at 787. If the saved demolition costs are factored in, the project would be economically feasible at certain daily tonnage levels. In particular, if the $34 million figure is used, the project appears to become economically feasible at each of the three daily levels. Nevertheless, the ICC noted that Conrail would probably have to acquire more land, at a greater cost, just to achieve the 1500 ton-a-day level and that the costs of compacting and loading equipment and of painting and maintaining the viaduct over which the Highline runs were not included in the analysis. Given these facts, the ICC concluded that the project was economically infeasible at the $7 and $11 million demolition figures. The Commission could not say definitively if the project would be economically feasible at the $34 million figure. But in light of CPO's offer to indemnify Conrail for costs in excess of $7 million, the ICC concluded that the waste hauling project was economically infeasible. *Id.* at 789.

■ Conrail makes little effort to contradict these findings. Instead, it argues that

712

an adverse abandonment may be approved only if supported by a compelling public interest. *See* Brief for Petitioner at 32. It then asserts that the continued existence of the Highline will not prevent any significant public projects. Its arguments miss the mark, however. First, the Act does not require a showing of a *compelling* public interest in an adverse abandonment case. Rather, if the public interest and convenience permit the abandonment, the ICC can authorize it. 49 U.S.C. § 10903(a). Moreover, the ICC did not focus on the development of public projects. It found instead that the position of the New York parties in favor of abandonment was strong evidence that abandonment would serve the public interest because it would permit the possible development of other public projects. The key to the Commission's conclusion was that no use existed for the Highline and it therefore did not serve the public convenience and necessity. Interference with possible future projects bolsters this finding.

The ICC's decision that the plan is impracticable and economically infeasible is reasonable. In light of its finding and the fact that Conrail has other lines over which to haul waste out of New York City if it wants to, the record supports the ICC's decision and the decision is adequately explained.

### B. Statutory Presumption

█ Relying on two statutes not directly applicable here, Conrail contends both that there is a statutory presumption in favor of maintaining rail lines and that it is illogical to grant an adverse abandonment over a carrier's objections. Conrail first notes that section 10905 of the Act prohibits the ICC from issuing an abandonment certificate if a financially responsible party is willing either to subsidize freight transportation over or to purchase the line, even when the carrier seeks abandonment. 49 U.S.C. § 10905. Second, Conrail points to the National Trails System Act Amendments of 1983, 16 U.S.C. §§ 1241 *et seq.* (Trails Amendments), which allow a state or private entity wanting to use a rail line as a trail to "bank" the line for possible further use, in lieu of the ICC issuing an abandonment certificate. Under both

statutes, a financially responsible third party opposing abandonment can prevent the abandonment. Conrail maintains that both statutes evidence Congress's intent to maintain rail lines. Moreover, Conrail argues that it is illogical that third parties can prevent abandonment but the owner of a line cannot.

There are several problems with Conrail's argument. The first and most obvious difficulty is that neither statute is applicable here. No party has sought to invoke the Trails Amendments; a party attempted to purchase the Highline pursuant to section 10905 but the ICC found it not financially responsible. Thus, the statutes do not directly prohibit abandonment. Conrail argues by analogy, however: both statutes indicate Congressional intent to preserve rail lines, the goal Conrail pursues. But the analogy highlights the second problem with Conrail's argument: if line maintenance is the overriding goal of congressional policy, adverse abandonment should no longer be available. We do not believe, however, that section 10905 or the Trails Amendments were intended to eliminate the ICC's authority to grant adverse abandonments. Nothing in the language of the Trails Amendments or of section 10905 suggests such a result and the Supreme Court has noted that the Trails Amendments are not a blanket prohibition of all abandonments. *See Preseault v. ICC,* 494 U.S. 1, 19 (1990).

More to the point, it is clear that the aim of section 10905 is not simply the maintenance of rail *lines* but the continuation of rail *service.* The ICC must dismiss an abandonment application if the carrier and the party offering financial assistance "enter into an agreement *which will provide continued rail service.*" 49 U.S.C. § 10905(e) (emphasis added). The question therefore is not whether Conrail is a financially responsible party opposing abandonment, but whether Conrail can provide continued service over the Highline. The ICC determined that it cannot. Assuming the determination is correct, there is nothing inconsistent in permitting abandonment here.

Similarly, while the Trails Amendments serve the general purposes of preserving rail lines for reactivation, protecting rail trans-

portation corridors and encouraging energy efficient transportation, *see* 16 U.S.C. § 1247(d), they prohibit abandonments only in limited circumstances. Specifically, "in the case of interim use of any established railroad rights-of-way ..., *if* such interim use is *subject to restoration or reconstruction for railroad purposes,* such interim use shall not be treated ... as an abandonment." *Id.* (emphasis added). The ICC's finding of no potential Highline traffic negates the condition necessary to invoke the Trails Amendments, that is, that the use is subject to restoration for rail service. Additionally, a state, political subdivision or qualified private party must be willing to assume full responsibility for the line during its interim use. *Id.* Here, no party has come forward to take responsibility for managing the line as a trail. Only if a party does so may a line be "banked" for future rehabilitation as an active line. The Trails Amendments do not indicate a general prohibition on abandonments, adverse or otherwise.

### C. Commission Precedent

Conrail claims that the Commission's own precedent prevents abandonment of the Highline. The ICC, of course, argues that its decision is consistent with precedent. An examination of the precedent reveals, however, that it is not especially helpful to either party.

In *Modern Handcraft, Inc.,* 363 I.C.C. 969 (1981), the Commission granted an adverse abandonment certificate over the railroad's objections. The Commission found that a *de facto* abandonment had already occurred: no rail service over or rail maintenance to the track had occurred for twelve years; the carrier had made no serious efforts to attract traffic; the line was being used as a parking lot and for billboard postings; and the carrier objected to the abandonment apparently only in order to inflate the sale price of the line. *Id.* at 971. Under the circumstances, the ICC declared that it would "not allow [its] jurisdiction to be used to shield a carrier from the legitimate processes of State law." *Id.* at 972.

While *Modern Handcraft* does show that the ICC can grant an adverse abandonment certificate over the objection of the rail carrier, it is not otherwise especially instructive. Here, the ICC did not find that a *de facto* abandonment had occurred, apparently because Conrail has made some serious—albeit fruitless—efforts to attract traffic. *Modern Handcraft* differs in important particulars and therefore does not compel a result in favor of either party.

Both parties also point to *Wisconsin Dep't of Transp.,* Finance Docket No. 31303 (1988) (*Wisdot*), as either instructive or distinguishable. But *Wisdot* is simply not on point. First, it is factually distinguishable: (1) the carrier who opposed the abandonment was currently using the line; (2) there was a significant possibility of increased traffic; and (3) the carrier, a warehouse served by the line, the current shipper, a potential shipper and the local community all opposed the abandonment. *Id.* at 4. Second, *Wisdot* did not involve an adverse abandonment under section 10903 but rather an effort to force abandonment under section 10505. *Id.* at 3. The standards for the two sections are different. *Wisdot,* therefore, adds little to the analysis of this case.

Finally, this case is not controlled by *City of Colorado Springs & Metex Metro. Dist.,* Finance Docket No. 31271 (1989) (*Metex*). In *Metex,* the ICC declined to grant an adverse abandonment certificate, but it did so with good reason:

[The carrier] has not embargoed the line and holds itself out to repair it to provide any service that may be needed. Efforts are being made to solicit traffic; future through traffic movements are possible and are supported by a grant of public funds; and [the carrier] has purchased a bridge and is ready to install it. [The carrier, a shipper, and the state public utilities commission] object to abandonment. Because there is a real potential for reactivation of service, abandonment could adversely affect shippers.

*Id.* at 6. *Metex* differs from this case in the most significant aspect: in *Metex* the ICC found "a real potential" for future service but here it found that "Conrail's proposed waste hauling arrangement is not feasible and that there are no other prospects for future traffic

on the line." JA at 85. A case in which a "real potential" for future service exists does not control the outcome of a case where no potential service exists. None of the ICC precedent is especially helpful in resolving this case. The precedent neither compels nor prohibits the issuance of an abandonment certificate for the Highline. Thus, the ICC's conclusion that the public convenience and necessity permit abandonment here is not in conflict with its precedent.

### D. The Indemnity Condition

■ The New York parties argue that the ICC lacks jurisdiction to impose the $7 million bond requirement and that even if it does have jurisdiction, the condition is arbitrary and capricious. CPO agrees and argues further that the ICC misconstrued CPO's "offer" to indemnify Conrail. According to CPO, the offer was open for a limited time but, because Conrail did not accept it, the offer lapsed. Therefore, CPO argues, the condition cannot be imposed. CPO's argument, however, is irrelevant. The indemnity condition is not a binding contract that CPO has been forced to enter into. Rather, the condition is merely a condition precedent to the ICC's issuance of the abandonment certificate: if CPO fails to post the bond, no certificate will issue. The only relevant questions are whether the ICC has the authority to impose the condition and, if so, whether it imposed it in an arbitrary and capricious way. Assuming the ICC *could* impose the condition, it does not matter whether CPO *agreed* to be bound.

■ Section 10903 of the Act provides that if the ICC finds that abandonment serves the public convenience and necessity, it is to approve the application and "require compliance with conditions that the Commission finds are required by public convenience and necessity." 49 U.S.C. § 10903(b)(1)(A)(ii). There is no restriction placed on the conditions the ICC can impose other than that they must be required by the public convenience and necessity. Its broad authority defeats the claim of the New York parties that the ICC's action represents "an unwarranted intrusion into New York State's jurisdiction over property laws." Opening

Brief of New York Governmental Parties at 9. That issue would give us pause were it before us to determine. But the ICC has not attempted to alter New York property law—it has merely decided that the public convenience and necessity will permit abandonment of the Highline if CPO posts the requisite surety bond. Moreover, CPO is estopped from contesting the ICC's authority to impose the surety condition because, by submitting evidence of its indemnity offer, CPO intended to influence the ICC, precisely the result it achieved. CPO cannot now argue that the Commission was wrong to rely on evidence CPO put before it. *See ATC Petroleum, Inc. v. Sanders,* 860 F.2d 1104, 1111 (D.C.Cir.1988) (noting that doctrine of estoppel "preclud[es] a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that litigant's conduct").

In analyzing the economic feasibility of Conrail's proposed waste hauling project, the ICC found that it was unclear whether the plan was economically infeasible if demolition costs were $34 million. Because CPO did not prove that demolition costs would in fact be lower, it could not carry its burden of proving that the plan was economically infeasible. At the same time, however, the ICC could not conclude that the plan *was* economically feasible at the $34 million level. To resolve the difficulty, the ICC imposed the surety bond condition. The condition allows CPO to meet its burden of proof by demonstrating, through its willingness to indemnify, that the demolition costs will not exceed $7 million. At the $7 million level the plan is clearly economically infeasible. Thus, because CPO placed the surety offer in the record "to put to rest" the issue of the demolition costs, JA at 596, and because the resolution of the demolition costs issue at $7 million allows the Commission to decide the economic feasibility issue, it acted reasonably in imposing the condition. *Cf. United States v. Chesapeake & O. Ry.,* 426 U.S. 500, 514–15, 96 S.Ct. 2318, 2325, 49 L.Ed.2d 14 (1976) (upholding ICC's condition on tariff increase because it would further purpose for which parties sought increase). As the Commission declared, "the surety requirement [is] necessary to ensure a proper and equitable resolution of the issues

here, and, thus [is] required by the public convenience and necessity." JA at 86 n. 23. Because the public convenience and necessity finding is supported by the record and adequately explained, we will not disturb it.

The ICC engaged in reasoned decisionmaking when it permitted abandonment of the Highline subject to CPO's posting of a surety bond. Because the decision was adequately explained and supported by the record, the petitions for review are

*Denied.*